*DeAngelo Montier Stanley v. State of Maryland*, No. 521, Sept. Term 2019.  Opinion by Arthur, J.

**CRIMINAL PROCEDURE—CROSS-EXAMINATION**

Defendants have the right to cross-examine witnesses about matters relating to their biases, interests, or motives to testify falsely, but this right is not unlimited.  In this case, the trial court permitted the defense to elicit testimony that a prosecution witness made numerous allegations against the defendant and others under an expectation of leniency.  The court did not abuse its discretion in restricting cross-examination about the details of the witness's allegations against others, such as their names and the crimes that they allegedly committed.

**CRIMINAL PROCEDURE—SUFFICIENCY OF THE EVIDENCE**

On review of the sufficiency of the evidence, the appellate court does not re-weigh the evidence or re-assess the credibility of witnesses.  Here, even though the defendant identified many reasons to disbelieve two witnesses who implicated the defendant, the jury could reasonably conclude that the defendant committed the offense.

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 521

September Term, 2019

_____

DEANGELO MONTIER STANLEY

v.

STATE OF MARYLAND

_____

Nazarian,
Arthur,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Arthur, J.
_____

Filed:  December 16, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

On August 5, 2018, two strangers assaulted Johnata DeCastro on a Salisbury street, permanently disabling him. Crediting evidence that appellant DeAngelo Stanley was one of those assailants, a jury in the Circuit Court for Wicomico County convicted him of first- and second-degree assault and reckless endangerment. The court sentenced him to imprisonment for 18 years.

In this timely appeal, Stanley presents the following questions:

1. Did the trial court err in limiting defense counsel's cross-examination of Glay Kimble, a jailhouse informant and critical State witness?

2. Is the evidence sufficient to sustain [Stanley's] convictions?

We conclude that the trial court did not err or abuse its discretion in restricting the cross-examination. We also conclude that the evidence, viewed in the light most favorable to the State, was sufficient to support Stanley's convictions. Consequently, we shall affirm the convictions.

## BACKGROUND

At some point after 1:00 a.m. on August 5, 2018, Johnata DeCastro and his wife, Raquel Queiroz, were driving along Church Street in Salisbury, heading to her sister's house to pick up their child. DeCastro had gotten extremely drunk at a party, and he and Queiroz were arguing. Three blocks from their destination, DeCastro got out of the car, shouted back at Queiroz, and walked away.

When her husband was approximately 25 to 30 feet away from the corner of Church Street and Davis Street, Queiroz saw that two men, one white and the other a "dark-skinned," "skinny" African American with dreadlocks, were walking with

DeCastro. One of the men put his hands on DeCastro's shoulder and said something, which Queiroz could not hear. By the time Queiroz rounded the block and circled back, she did not see anyone.

According to DeCastro, two men came up to him while he was walking away from his car. They started grabbing at his bag. When they rounded a corner, the men hit him on the head, and he fell to the ground. He remembers nothing else.

At 1:41 a.m. on August 5, 2018, police officers and paramedics responded to a report of a "man down" behind 700 East Church Street, at the intersection of Church and Davis Streets. They found DeCastro behind a garage or shed in the back of the house. He was unconscious and bleeding, with head wounds that included a basal skull fracture, a "brain bleed" (apparently a hemorrhage of the blood vessels in the brain), and "scalping" injuries consistent with being kicked. His wallet was nearby, but $100 in cash was gone.

Felipe Perez had called 911 to report the altercation in which DeCastro was assaulted. At the scene, Perez, who has a mental disability, told the police that he saw a couple of people arguing out on the corner.

Although many of the neighbors came out to watch the police officers and EMTs, no one gave any information about what had occurred. Porsha DuPont, who lived at 700 East Church Street, told the investigators that she "didn't see anything."

DeCastro was in a coma for three days and was unable to be interviewed for several weeks. Even then, he was unaware of his surroundings or of the year, and he seemed to believe he was back in his native Brazil. His traumatic brain injuries have left

him with epilepsy, impaired language and motor skills, and personality changes. He remains unable to work.

On August 28, 2018, a Salisbury police detective received an anonymous call from a woman who reported that she had information about the assault that happened on Church Street. The police traced the call to Cotrenna Drayton. She denied making the call and refused to talk to the detective.

On September 13, 2018, Drayton was arrested on unrelated charges. She initially refused to make any statement about the Church Street assault, but she changed her mind when the investigators told her that the State's Attorney had "options" to address her concerns about her safety.[1] Although Drayton was initially tearful and reluctant to talk, she eventually gave a recorded statement, in which she told the police that on August 5, 2018, she was driving on Barclay Street in Salisbury, toward its intersection with Church Street. She pulled up at the stop sign, from which she could look toward 700 East Church Street and the intersection of Church Street and Davis Street. She said that she "caught the end" of the assault and saw "DeAngelo" (i.e. Stanley) kicking the victim.

Drayton identified Stanley from a photo array. Next to the photograph of Stanley, Drayton wrote, "[T]hat's the person that we talked about earlier."

At trial, Drayton gave a different account, refusing to implicate Stanley. She testified that she and Stanley had a relationship that ended "back around August 2018[,]" that she did not see Stanley "kick anybody in the head[,]" and that she did not tell the

---

[1] According to the State, Drayton ultimately received nothing of value.

3

police that she saw Stanley at the scene of the assault. Admitting that she did not want to be in court, she claimed that she could not see the assault while stopped on Barclay Street. A Salisbury police detective had previously testified on cross-examination that a person could not see the location where the victim was found (behind a shed or garage at the back of 700 East Church Street) from the intersection of Church and Barclay Streets.[2]

After reviewing a transcript of the recorded statement that she gave to the police, Drayton claimed that she did not recall identifying Stanley. She continued to claim that she knew nothing about the assault. She nevertheless admitted that her handwriting was on the photograph of Stanley in the photo array. The court admitted the recorded statement under Md. Rule 5-802.1(a)(3), the hearsay exception for prior inconsistent statements recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement.

A second informant, Glay Kimble, also implicated Stanley in the assault on DeCastro. Kimble told the investigators that, when he and Stanley were incarcerated on unrelated charges on August 30, 2018, Stanley had admitted his involvement in multiple crimes, including an assault on Church Street in which Stanley believed that the victim

---

[2] Because it is difficult to grasp the configuration of the various intersections without a visual guide, and because there was some question at trial about whether Drayton could have seen an assault near the intersection of Church and Davis Streets from the intersection of Church and Barclay Streets, we have attached copies of State's Exhibit 4 and Defendant's Exhibit 2 in the appendix to this opinion. State's Exhibit 4 is an aerial photograph that shows the intersection and Church and Davis Streets and the nearby intersection of Church and Barclay Streets. Defendant's Exhibit 2 is an image of 700 East Church Street (including the shed or garage at the back of the property), taken from the intersection of Church and Barclay Streets.

"did not make it." During a police interview earlier that same month, Kimble had implicated others in unrelated crimes.

At trial, Kimble testified that Stanley had approached him while they were both in jail. Stanley inquired whether Kimble was the father of Drayton's son. When Kimble answered that he is, Stanley warned him that he "needed to get [his] son" because Drayton "knew some things" that Stanley had done and was threatening to call the police about them. In response to Kimble's question about what Drayton knew, Stanley said that he had beaten someone up on Church Street, that he was not sure whether the person had died, but that he did not think that the person had made it. According to Stanley, the beating occurred near a white house where "Dave" and Porsha DuPont lived.

On cross-examination, the defense established that Kimble initially told the investigators that Stanley had described the victim as a woman. Kimble tried to explain away that statement by saying that Stanley was "beating on" Drayton, and he did not know whether Stanley was referring to her as a person who knew about the assault or as the victim.

Although Kimble had received a benefit for testifying in other cases (he got into a drug-rehabilitation program), he insisted that he did not receive anything for testifying against Stanley in this case.

David Cutler, a resident of 700 East Church Street, testified that he had seen Stanley "a lot in Salisbury" and that Stanley would hang out on the porch of Cutler's house "[o]ff and on." Cutler recalled seeing Stanley on the porch earlier on the day of the assault. On cross-examination, Cutler stated that had never seen Stanley with dreadlocks.

5

Porsha DuPont, called by the defense, testified that she was living at 700 East Church Street on August 5, 2018, but "really didn't know" DeAngelo Stanley. She said that she "didn't see him all that day or night." Like Cutler, she testified that she had never seen Stanley with dreadlocks.

The defense also called Darrell Mainor, who had been in an intimate relationship with Cotrenna Drayton when she was arrested in September 2018. Mainor testified that when he picked Drayton up from jail after she had been arrested, she told him that she had falsely accused Stanley in order to obtain favorable treatment. According to Mainor, Drayton said: "I lied on him whatever, saying, basically, that he really did it, but he really didn't."

On cross-examination, Mainor admitted that he had "just recently" been housed with Stanley "on lockup[.]" When asked why he had not come forward earlier with exculpatory information that he had had since last September, Mainor claimed he "was working or . . . had warrants out." Mainor acknowledged that, even though he had been incarcerated for the last four months, he did not notify anyone in law enforcement that Drayton had told him about her false accusation against Stanley. Instead, he waited until "about three or four days" before trial, to tell defense counsel what Drayton had allegedly said.

In closing argument, defense counsel argued that there was reasonable doubt about whether Stanley assaulted DeCastro because neither Drayton nor Kimble were reliable witnesses. Counsel maintained that Drayton falsely accused Stanley and recanted her accusation and that Drayton could not have seen the assault from the intersection where

6

she claimed to have stopped.  Counsel also maintained that Kimble was an unreliable jailhouse informant who had fabricated Stanley's confession in order to get favorable treatment on charges in other cases, but that he "got it all wrong" by claiming that the victim was a woman.  Counsel pointed out that no physical evidence linked Stanley to the crime and that, unlike the person described by Queiroz, Stanley has never worn dreadlocks.

The jury acquitted Stanley of attempted first- and second-degree murder, but convicted him of first- and second-degree assault, as well as reckless endangerment.

## DISCUSSION

### I.    Cross-Examination Challenge

Stanley contends that "[t]he trial court's refusal to allow defense counsel to cross-examine jailhouse informant Glay Kimble about the multitude of other people he identified as murderers in August 2018 violated the Confrontation Clause as well as principles of fundamental fairness and due process, and otherwise amounted to an abuse of discretion."  After reviewing the relevant law and the record, we disagree.

**Standards Governing Review of Cross-Examination of Prosecution Witness About Bias Based on Dealings with Law Enforcement**

The Confrontation Clause of the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee criminal defendants the ability to confront the witnesses against them.  *See*, *e.g*., *Martinez v. State*, 416 Md. 418, 428 (2010); *Church v. State*, 408 Md. 650, 663 (2009).  This right includes the opportunity to cross-examine witnesses about matters relating, among other things, to

7

their biases, interests, or motives to testify falsely.  *See*, *e.g.*, *Martinez v. State*, 416 Md. at 428 (citing *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)); *accord Marshall v. State*, 346 Md. 186, 192 (1997).

"Where a witness has a 'deal' with the State, the jury is entitled to know the terms of the agreement and to assess whether the 'deal' would reasonably tend to indicate that his testimony has been influenced by bias or motive to testify falsely."  *Marshall v. State*, 346 Md. at 197-98.  Thus, for example, a trial court may not restrict cross-examination about the pending charges against the State's eyewitness, *Manchame-Guerra v. State*, 457 Md. 300, 303, 322 (2018); about whether a State witness's testimony was motivated by the hope of favorable treatment on other charges, *Martinez v. State*, 416 Md. at 431-32; or about whether a State witness came forward "in the hope of being released from detention, and whether he was testifying at trial in the hope of avoiding a violation of probation charge."  *Calloway v. State*, 414 Md. 616, 619-20, 637 (2010).[3]

"The ability to cross-examine witnesses, however, is not unrestricted."  *Martinez v. State*, 416 Md. at 428.  In accordance with its duty and power to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" (Md. Rule 5-611(a)), a trial court may exercise its discretion to "impose reasonable limits on cross-examination when necessary for witness safety or to prevent harassment, prejudice, confusion of the issues, and inquiry that is repetitive or only marginally

---

[3] The primary evidentiary contributors to false convictions include lying jailhouse informants.  Jeffrey Bellin, *The Evidence Rules that Convict the Innocent*, 106 Cornell L. Rev. ---- (2020) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id= 3547421).

relevant." *Martinez v. State*, 416 Md. at 428. These limits do not infringe a defendant's confrontation rights so long as the defendant has reached "the 'constitutionally required threshold level of inquiry'" (*Martinez v. State*, 416 Md. at 428, quoting *Smallwood v. State*, 320 Md. 300, 307 (1990)), that is, so long as the defendant "has been 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness[.]'" *Id.* (quoting *Davis v. Alaska*, 415 U.S. at 318); *accord Manchame-Guerra v. State*, 457 Md. at 309-10. In summary, "[a] judge must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices, but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Marshall v. State*, 346 Md. at 195.

On appeal, the standard of review "takes into account both the defendant's constitutional right of confrontation and the discretionary authority of the trial judge to assert 'control over the mode and order of interrogating witnesses and presenting evidence.'" *Manchame-Guerra v. State*, 457 Md. at 311 (quoting Md. Rule 5-611(a)).

> In controlling the course of examination of a witness, a trial court may make a variety of judgment calls under Maryland Rule 5-611 as to whether particular questions are repetitive, probative, harassing, confusing, or the like. The trial court may also restrict cross-examination based on its understanding of the legal rules that may limit particular questions or areas of inquiry. Given that the trial court has its finger on the pulse of the trial while an appellate court does not, decisions of the first type should be reviewed for abuse of discretion. Decisions based on a legal determination should be reviewed under a less deferential standard. Finally, when an appellant alleges a violation of the Confrontation Clause, an appellate court must consider whether the cumulative result of those decisions, some of which are judgment calls and some of which are legal decisions, denied the

9

appellant the opportunity to reach the "threshold level of inquiry" required by the Confrontation Clause.

*Manchame-Guerra v. State*, 457 Md. at 311 (quoting *Peterson v. State*, 444 Md. 105, 124 (2015)).

## Cross-Examination Record

During direct examination, the prosecutor elicited Kimble's testimony that he "provide[d] information in other cases not related to this" one. Kimble told the jury that Stanley's involvement in the DeCastro assault "came up" "[d]uring the course of [his] cooperation in those other cases." Kimble insisted, however, that he did not "receive any benefit for [his] testimony" "in this particular case."

On cross-examination, defense counsel sought to impeach Kimble's credibility by establishing that he was a "jailhouse snitch" in multiple cases:

> [DEFENSE COUNSEL]: You call yourself a snitch, is that correct?
>
> [KIMBLE]: I guess if you want to call it telling, snitching, I did.
>
> [DEFENSE COUNSEL]: Telling, okay.
>
> And you have done that in several cases, is that correct?
>
> [KIMBLE]: I did.

Defense counsel also sought to impeach Kimble's credibility by establishing that he fabricated his testimony that Stanley made incriminatory statements about the DeCastro assault:

> [DEFENSE COUNSEL]: [W]hen you were interviewed by the police, you implicated numerous people in murders, is that correct?
>
> [PROSECUTOR]: Your Honor –

10

THE COURT: Sustained.

[DEFENSE COUNSEL]: It's your contention to the police that numerous people come to you and confess their crimes, correct?

[PROSECUTOR]: There's multiple different interviews –

THE COURT: If you're going to say objection, say objection.

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Mr. – Mr. Stanley's – the accusation you made against Mr. Stanley was one of many accusations you made against people to these detectives, is that correct?

[KIMBLE]: Yes.

[DEFENSE COUNSEL]: Okay.

[KIMBLE]: And they were true. . . .

[DEFENSE COUNSEL]: Okay.

They're all true.

You said you're out of jail now, correct?

[KIMBLE]: I'm still in an institution.

[DEFENSE COUNSEL]: What institution?

[KIMBLE]: I'm in the NCTC [sic]. It's like the Malcolm Manor Treatment . . . Facility [sic].[4]

[DEFENSE COUNSEL]: And that's a rehab?

[KIMBLE]: It's a behavior modification treatment center.

---

[4] Kimble may have said that he was at "MCTC" (the Maryland Correctional Training Center near Hagerstown) and that he was in treatment at the Mountain Manor Treatment Center, which has locations in Sykesville and West Baltimore, among other places.

11

[DEFENSE COUNSEL]: Okay.

And at the time you talked to the detectives, you were in jail, correct?

[KIMBLE]: Several jails.

[DEFENSE COUNSEL]: Several jails.

And you had 14 years hanging over your head that you thought you might get?

[KIMBLE]: 13.

[DEFENSE COUNSEL]: 13, is that correct?

[KIMBLE]: Yes, sir.

[DEFENSE COUNSEL]: But instead from the State you got rehab?

[KIMBLE]: Or I could have did [sic] three years and came home off the 13.

[DEFENSE COUNSEL]: And . . . that's what you do. When you go to jail, you start telling on people to get reduction of sentences, isn't that correct?

[KIMBLE]: Actually, I could have served three years.

[DEFENSE COUNSEL]: You could have served what?

[KIMBLE]: I could have did [sic] three years. It was just three years off the 13. So I really wasn't looking at 13. It was just the number, but the actual sentence I had to do was three years.

[DEFENSE COUNSEL]: Okay.

[KIMBLE]: So it wasn't to come home from jail. I really needed some rehabilitation and for my drug addiction [sic].

[DEFENSE COUNSEL]: But when you were talking to the detectives about these people confessing to you, you wanted a deal, didn't you? You wanted leniency?

[KIMBLE]: It wasn't a deal. It was help, treatment.

12

[DEFENSE COUNSEL]:  Help.

[KIMBLE]:  I didn't actually go to home, and I probably could have went [sic] home.  I asked to get help.

[DEFENSE COUNSEL]:  You could have what?

[KIMBLE]:  I probably could have been released and went home [sic], but I asked for drug treatment.

[DEFENSE COUNSEL]:  You had a violation of probation with 13 years of rehab.  What do you mean you could be released and go home?

[KIMBLE]:  I said I probably could have asked to be released.  I asked for drug treatment.

[DEFENSE COUNSEL]:  Okay.

And that was part of the deal with the State for testifying against someone.

[KIMBLE]:  Not for Stanley.

[DEFENSE COUNSEL]:  Not for Stanley, but for testifying against someone whose information you gave to the detectives on August 8th.

[KIMBLE]:  They're not here.

[DEFENSE COUNSEL]:  Who's not here?

[PROSECUTOR]:  Your Honor, I'm going to object.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Okay.

And do you remember saying to the officers, you all got to help me out, tell the State's Attorney, man, please?

[KIMBLE]:  I can vaguely remember.

[DEFENSE COUNSEL]:  And there was [sic] discussions about telling the State's Attorney this information that you were given, isn't that correct?

13

[KIMBLE]: Several discussions about Stanley?

[DEFENSE COUNSEL]: No, of in general, telling the State's Attorney about the information you were given?

[KIMBLE]: I'm here for Stanley.

[DEFENSE COUNSEL]: I understand you are here for Stanley. . . .

And I asked you whether you had several conversations about talking to the State's Attorney for the information you were giving?

[KIMBLE]: I really don't feel comfortable talking about other people's case [sic].

THE COURT: Well, you just answer the questions you're asked, sir.

[KIMBLE]: Vaguely. . . .

[DEFENSE COUNSEL]: Okay.

Do you remember telling – when you were talking about Mr. Stanley to the police detectives, you told them Mr. Stanley told you, well, I had to beat the click [sic], man.[5] They ended up dying?

[KIMBLE]: I do.

[DEFENSE COUNSEL]: Okay. There wasn't anything about maybe it was a woman, maybe it wasn't. It was being a chick?

[KIMBLE]: Yes.

On redirect examination, the prosecutor elicited Kimble's testimony that police interviewed him twice while he was incarcerated, on August 3 and August 30, 2018. Kimble confirmed that "the only discussion regarding Mr. Stanley came from the August

---

[5] Based on the next question a few lines below, we surmise that "click" is an error in transcription. The defense attorney probably asked whether Stanley said that he had to beat the "chick."

30th interview[,]" whereas he had asked "for help" "during the earlier [August 3] interview."  The prosecutor then inquired about Kimble's accusations against others:

> [PROSECUTOR]:  When you received a benefit for your testimony, was that in the case of Lee Braboy and Dionte Dutton?
>
> [KIMBLE]:  And them only.
>
> [PROSECUTOR]:  And have you, in fact, already testified in Lee Braboy?
>
> [KIMBLE]:  Yes, ma'am.
>
> [PROSECUTOR]:  So you have fulfill[ed] your obligation to the State?
>
> [KIMBLE]:  I have.
>
> [PROSECUTOR]:  Are you receiving any further benefit for your testimony here?
>
> [KIMBLE]:  No, ma'am.

Defense counsel declined the opportunity for re-cross-examination, but requested a bench conference to note the following objection:

> [DEFENSE COUNSEL]:  I would like to put on the record that I was not allowed to cross-examine . . . . the witness on the multitude of people that he implicated to these detectives.  I think that is relevant to his credibility.  He said he implicated Braboy in two killings.  Said that Willie Moss committed a murder.  Tinker committed a murder.  Jabre committed a murder.  Jayca committed a murder.
>
> And he testified against Dante Miles and D.J.  And he also said that Jason Lewis killed Bugger and that Molik Evans killed Jason Lewis.
>
> I think it goes to his credibility, Your Honor.

Once counsel had returned to the trial table, the defense confirmed that it had no more questions for the witness.

15

**Stanley's Challenge**

Stanley contends that the trial court's "limitation on cross-examination unfairly prevented the defense from exposing facts that were highly relevant to Mr. Kimble's credibility." In Stanley's view, the jury could have found "Kimble's testimony far less believable if it knew that [Stanley] was only one of a multitude of alleged murderers that Mr. Kimble named to police over the course of a single month." The alleged error was prejudicial, he maintains, because "[t]he State relied on Mr. Kimble's testimony heavily in its closing argument."

The State counters that the trial court "provided Stanley a sufficient opportunity to explore Kimble's potential motives to testify falsely" and that the court "did not abuse its discretion in limiting cross-examination into extraneous and irrelevant matters." In any event, the State argues, "any error was harmless beyond a reasonable doubt" because Stanley "thoroughly cross-examined Kimble about his repeated cooperation with the State and the details of his deal for testifying in other cases[,]" eliciting admissions that Kimble testified against two others.

We hold that the trial court did not violate Stanley's right of confrontation, because the challenged rulings did not prevent defense counsel from cross-examining Kimble about his cooperation with the State, including his expectation of leniency based on the information that he proffered against "many" people other than Stanley.

As the excerpted transcript shows, the court initially sustained an objection to a question about whether Kimble had "implicated numerous other people in murders." The court also sustained an objection to a rhetorical question about whether "numerous people

come to [Kimble] and confess their crimes." From that point on, however, defense counsel successfully proceeded with a lengthy cross-examination, in which he elicited Kimble's testimony that while he was incarcerated and facing 13 years in prison for violating his probation, he had made "many accusations" against other persons; that he "tells" on "people" to get his sentences reduced; that he made a deal with the State based on his accusations against others; and that as a result of the information and testimony that he provided in those other cases, he obtained leniency in the form of drug rehabilitation rather than jail.

The court did not curtail the cross-examination about Kimble's expectations of leniency. To the contrary, when defense counsel asked "whether [Kimble] had several conversations about talking to the State's Attorney for the information [he] was giving[,]" and Kimble said that he did not "feel comfortable talking about other people's cases[,]" the trial court instructed him to "answer the questions" that he was asked. As a result, defense counsel was able to elicit Kimble's reluctant admission that he "[v]aguely" recalled such conversations. Defense counsel, however, did not pursue the matter any further.

The only other restriction on cross-examination occurred when Kimble said that the persons against whom he testified in exchange for leniency were "not here." When defense counsel asked, "Who's not here?," the court sustained the State's objection. This ruling did not interfere with Stanley's right to confront Kimble, because defense counsel had an opportunity to establish that Stanley had implicated "many" others with an expectation of sentencing leniency. It was unnecessary for Kimble to name each person

17

he had denounced for the defense to make the point that he was an inveterate informant who was accustomed to trading allegations for favors.

Significantly, defense counsel never asked Kimble precisely how many people he had implicated. Consequently, the trial court did not restrict the cross-examination to prevent Stanley from establishing that Kimble made accusations against "a multitude of people" during his two meetings with the detectives. Moreover, the trial court did not err or abuse its discretion in foreclosing questions about the names of others whom Kimble accused and the substance of those allegations, because those matters were either irrelevant or likely to confuse or distract the jury.[6]

In any event, defense counsel later had an opportunity to pursue that line of inquiry, but elected not to do so. On redirect, the State asked Kimble about the information and testimony he provided in the Braboy and Dutton cases. But even though the State had arguably opened the door to an inquiry about those cases, defense counsel declined to ask any questions on re-cross-examination. Instead, defense counsel objected for "the record" that he "was not allowed to cross-examine the witness on the multitude of people that he implicated" and listed names of the persons whom Kimble had allegedly accused of murder. The trial court acknowledged that "[a] proffer ha[d] been made" and

---

[6] In voir dire, neither of the parties had asked the court to mention any of the names proffered by defense. The court could legitimately have been concerned about the prospect of introducing those persons into the case at that late juncture.

asked whether counsel was "through with this witness[.]" Defense counsel again answered that he had no further cross-examination.[7]

We are satisfied that the cross-examination of Kimble exceeded the constitutional threshold under the Confrontation Clause because it exposed facts pertaining to Kimble's proffer of information and testimony against Stanley and others under an expectation of leniency. After the trial court sustained objections to defense counsel's first two questions, counsel elicited that Kimble's accusation against Stanley was "one of many accusations [Kimble] made against people to these detectives[,]" that Kimble asked for and obtained a referral for drug rehabilitation even though he may have been facing up to 13 years for violating his probation, and that this sentence resulted from information and testimony that he provided in cases other than Stanley's (and perhaps in Stanley's as well). Consequently, Stanley was able to expose "facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Martinez v. State*, 416 Md. at 428. The court restricted the defense only in its ability to explore the details of the allegations that Kimble had made against other persons, such as their names and the crimes that they allegedly committed. The jury did not need those potentially confusing, collateral details to get the point that Kimble had a motivation (and perhaps even a disposition) to lie about Stanley.

---

[7] Similarly, on cross-examination, when Stanley attempted to dodge a question by saying that he didn't "feel comfortable talking about other people's case[s]," the court admonished him to answer. Defense counsel, however, did not follow up.

In addition to the Confrontation Clause, Stanley complains that the court's evidentiary rulings violated the common-law doctrine of verbal completeness. Under that doctrine, when one party offers part of a statement or part of a document, the opposing party may have the right to introduce the whole statement or document. *See Otto v. State*, 459 Md. 423, 427 n.3 (2018) (citing *Smith v. Wood*, 13 Md. 293, 296-97 (1869)); *accord* Md. Rule 5-106 (codifying the common-law rule). Stanley apparently contends that because he was able to offer parts of Kimble's several conversations with the detectives, he, and not the State, should also have been allowed to offer the entirety of these conversations. This is not how the doctrine of verbal completeness works. *See Otto v. State*, 459 Md. at 449-50.

Quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984), Stanley also complains that the rulings violated "prevailing notions of fundamental fairness," because, he says, it deprived him of a "meaningful opportunity to present a complete defense." Because the court allowed Stanley to reach "the 'constitutionally required threshold level of inquiry'" (*Martinez v. State*, 416 Md. at 428, quoting *Smallwood v. State*, 320 Md. 300, 307 (1990)) under the Confrontation Clause, the rulings did not deprive Stanley of a meaningful opportunity to present a complete defense. *Martinez v. State*, 416 Md. at 428, (quoting *Smallwood v. State*, 320 Md. at 307).

For these reasons, we hold that the trial court did not err or abuse its discretion in sustaining the State's objections during the cross-examination of Glay Kimble.

## II.      Sufficiency Challenge

Stanley argues that the evidence was "patently insufficient to sustain a conviction." He argues that "the only evidence against him" was Drayton's statement, which she recanted, and Kimble's trial testimony about an assault on a woman at some unknown time. According to Stanley, the jury could not reasonably rely on Drayton's identification of him as one of the assailants, because, he says, it was "literally impossible" for her to see the assault from the intersection where she said she was stopped. Moreover, Stanley contends, Kimble's testimony (that Stanley confessed to assaulting a woman), meant that Kimble had implicated him "in another assault entirely."

The State counters that "Stanley's precise claims are not properly before this Court" because in his motion for judgment of acquittal he did not argue the contentions that he presents on appeal. To the extent Stanley preserved his sufficiency challenge, the State argues that it was for the jury to decide whether Drayton could see Stanley from her vantage point and whether to credit her recorded identification of Stanley. Similarly, the State argues that the weight to be given Kimble's testimony was for the jury to determine.

For reasons that follow, we conclude that, to the extent Stanley's sufficiency challenge is preserved, the evidence supports his convictions.

### Preservation

When criminal defendants move for judgment of acquittal, Rule 4-324(a) requires them to "state with particularity all reasons why the motion should be granted." A defendant "is not entitled to appellate review of reasons stated for the first time on appeal." *Starr v. State*, 405 Md. 293, 302 (2008). Instead, the defendant must inform the

21

trial court of "the ways in which the evidence should be found wanting and the particular elements of the crime as to which the evidence is deficient." *Fraidin v. State*, 85 Md. App. 231, 244-45 (1991); *accord Arthur v. State*, 420 Md. 512, 522 (2011); *McIntyre v. State*, 168 Md. App. 504, 527 (2006). Although a defendant may "present the appellate court with a more detailed version of the argument advanced at trial[,]" trial courts need not "imagine all reasonable offshoots of the argument actually presented to them." *Starr v. State*, 405 Md. at 303; *accord Arthur v. State*, 420 Md. at 522-23.

Here, defense counsel moved for a judgment of acquittal on all counts at the end of the State's case, arguing the following grounds:

> The State's star witness, Ms. Drayton, testified she didn't see Mr. Stanley kick anybody. She also said that to the police until later in the testimony to the police [sic], she said something very vague that he kicked him, and then she said it was the other guy.

> It's very scant evidence, Your Honor, of the assault.

> Mr. Glay Kimble is a jailhouse snitch. He's a self-proclaimed snitch who commits crimes to keep his reputation up so that people don't think of him as a snitch.

> Although he says that he wasn't offered any leniency in this case. When he was making those statements, he hadn't gotten leniency yet. So the fact that he got it in a different case, he didn't know that at the time.

The trial court interjected that these points might go to the weight but not to the sufficiency of the evidence. On two occasions, defense counsel responded, "Right." Counsel then briefly reiterated the motion for judgment of acquittal on all charges before pivoting to address the charge of attempted first-degree murder, for which he said there was "no evidence of premeditation."

22

At the close of all the evidence, defense counsel renewed the motion for judgment of acquittal "on the same grounds," which he described as the "insufficiency of the evidence" and the "contradictory statements by the witnesses." He added that one of the State's witnesses had testified that Cotrenna Drayton "did not see" (or, more precisely, could not see) Stanley assault the victim. Finally, he reiterated that the State had no evidence of premeditation to support the charge of attempted first-degree murder.

On appeal, Stanley argues that it was impossible for Drayton to identify him from the location where she claimed to have seen the assault. He also argues that Kimble did not implicate Stanley in the assault of Johnata DeCastro, because Stanley reportedly described his victim as a woman. Stanley made the first of these arguments in his motion for judgment of acquittal at the end of all of the evidence, but he did not give the trial court any opportunity to consider the second. Consequently, in evaluating the sufficiency of the evidence, we shall consider the first argument, but not the second.

**Standards Governing Sufficiency Review**

In assessing the sufficiency of the evidence supporting a criminal conviction, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *McClurkin v. State*, 222 Md. App. 461, 486 (2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In applying that standard, we give 'due regard to the [fact-finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Id.* (quoting *Harrison v. State*, 382 Md. 477, 488 (2004)). On appellate review of

evidentiary sufficiency, a court will not "retry the case" or "re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185 (2010). The relevant question is not "whether the evidence *should have* or *probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State*, 85 Md. App. at 241 (emphasis in original); *accord Smith v. State*, 232 Md. App. 583, 594 (2017).

### Stanley's Challenge

At trial, it was undisputed that Johnata DeCastro was assaulted by strangers he encountered after getting out of his car on East Church Street. The issue before the jury was whether Stanley was one of those assailants.

The State relied heavily on Cotrenna Drayton's recorded statement, in which she implicated Stanley in the assault. Her statement was corroborated by circumstantial evidence, including the anonymous call that was traced to her, her reluctant and tearful demeanor in her encounter with the detective, and her written identification of Stanley in a photo array. This evidence impeached her trial testimony that she knew nothing about the assault. The jury was entitled to discount Drayton's recantation.

It is not decisive that, according to the testimony of a Salisbury police detective, a person could not see the place where the victim was found from the intersection where Drayton claimed to have witnessed the assault. The jury was not required to interpret Drayton's statement to mean that she had seen the victim when he was lying on the ground behind a shed, after he had been left for dead. Instead, the jury was entitled to

24

find that the altercation began before the victim disappeared behind the shed and that Drayton had seen that part of the altercation.

Turning to Kimble's testimony, Stanley tacitly concedes that it corroborated Drayton's identification and further inculpated Stanley. According to Kimble, Drayton "knew" that Stanley had beaten someone up "over on Church Street" and "was threatening" to "call the police about it," as she evidently did. The jury was not required to disregard Kimble's testimony because he had implicated others in exchange for promises of leniency and had arguably implicated Stanley in exchange for promises of leniency as well. Nor was the jury required to disregard Kimble's testimony because he may have understood Stanley to have said that the victim was a woman.

There is no question that the State had to overcome a number of challenges to prove its case. The victim had little recollection of what had occurred. The victim's wife said that one of the apparent assailants had dreadlocks, which Stanley's witnesses claimed that he had never worn.[8] The person who reported the crime had a mental disability and was unable to provide any useful information. None of the neighbors were willing to cooperate. The only eyewitness recanted. The other witness was a jailhouse informant.

On these facts, the jury certainly could have reasonably concluded that the State failed to prove its case. Nonetheless, in view of Drayton's recorded statement and

---

[8] In closing argument, the State attributed this discrepancy to an error in translation in the initial police interview: to understand the English language, the victim's wife needs an interpreter who is fluent in Portuguese.

Kimble's testimony, as well as the testimony concerning Stanley's presence at 700 East Church Street on the day of the assault, the jury could also have reasonably concluded beyond a reasonable doubt that Stanley was guilty of assault and reckless endangerment. The evidence was sufficient to support the convictions.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**





Google

Salisbury, Maryland

Google

Street View - Sep 2013

Image capture: Sep 2013 © 2019 Google



EXHIBIT
D#2
CIRCUIT COURT
Case No. CR18-0636
Date 3/18/19
WICOMICO COUNTY

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0521s19cn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0521s19cn2.pdf