*Terrence Belton v. State of Maryland*, No. 0720, September Term 2020; *Shakiea Worsley v. State of Maryland*, No. 0290, September Term 2020. Opinion by Moylan, J.

**HEADNOTE:**

**A SHOOTING AT AN OPEN-AIR DRUG MARKET – THE SON'S CONTENTION – A CASE NOT OF "WHODUNNIT?" BUT OF "WHYHEDUNNIT?" – DEMYTHOLOGIZING "MOTHER" – THE MOTHER'S NARRATIVE – THE SON'S NARRATIVE – THE MOTHER AS AN INITIAL AGGRESSOR – A NON-ISSUE: THE DEFENSE OF OTHERS – THE DEFENSE OF OTHERS: THE ROLE PLAYED BY THE "OTHER" – AUTOPSY AND BALLISTICS – PERFECT SELF-DEFENSE – A DRAMATIC APPELLATE CHAPTER: THE RECOGNITION OF THE IMPERFECT DEFENSES – IMPERFECT SELF-DEFENSE – THE ALLEGED SIGNIFICANCE OF THE VERBAL FRAGMENT – DON'T NEGELECT THE PROCEDURAL SIGNPOSTS – THE SELF-DEFENSE PARADIGM AS AN INDIVISIBLE ENTIRETY – STATUS AS A NON-AGGRESSOR – THE DUTY TO RETREAT VERSUS MOVING TO THE SOUND OF THE GUNS – THE RATIONALE FOR RESTRICTING SELF-DEFENSE – <u>CUNNINGHAM V. STATE</u> - "THE ROAD NOT TAKEN": THE INAPPLICABILITY OF SELF-DEFENSE AS AN ISSUE – THE ROAD TAKEN: HARMLESS ERROR – A. THINKING ABOUT HARMLESS ERROR – B. A TSUNAMI OF HOSTILE – THE MOTHER'S CONTENTION – A CHALLENGE NOT ADEQUATELY PRESERVED**

Circuit Court for Baltimore City
Case Nos. 119015009-10

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0720 & No. 0290

September Term, 2020

---

TERRENCE BELTON

v.

STATE OF MARYLAND

---

SHAKIEA WORSLEY

v.

STATE OF MARYLAND

---

Leahy,
Shaw Geter,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Moylan, J.

---

Filed:  December 28, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the Old English epic of <u>Beowulf</u>, the peace and tranquility of Hrothgar's Hall was initially shattered by the unexpected appearance of the monster Grendel. It was, even more direly, terrorized by the subsequent arrival of Grendel's Mother. In the case now before us, the peace and tranquility of South Monroe Street at McHenry Street was ruptured on December 6 of 2018 by the simultaneous appearances of both the son, Terrence Belton, and the mother, Shakiea Worsley. Literary scholars tell us that Hrothgar's Hall was situated in Geatland in what is now the southwestern corner of modern-day Sweden. Police experts tell us that the intersection of South Monroe Street and McHenry Street is an open-air drug market in what is now the southwestern corner of Baltimore City.

The appellant, Terrance Belton ("Son"), was convicted in the Circuit Court for Baltimore City by a jury of manslaughter and of two handgun offenses. The appellant, Shakiea Worsley ("Mother"), was convicted by the same jury in a joint trial of being an accessory after the fact to the manslaughter committed by the Son. Each appellant has filed a separate appeal raising separate issues. Because both appeals arose out of a single criminal incident, however, and because both sets of convictions were rendered in a single trial, we have consolidated the two appeals for present consideration.

Each appellant has raised a single contention. The contentions are completely unrelated. Although the legal analyses diverge widely and could easily have given rise to and, in effect, are two separate appeals, the two tightly interwoven factual narratives need to be told as a single tale.

**The Son's Contention**

The Son raises a single contention:

**THE COURT ERRED IN EXCLUDING APPELLANT'S TESTIMONY REGARDING THE VICTIM'S STATEMENT, "THIS IS MY BLOCK," WHICH WAS NOT HEARSAY AND CRITICAL TO APPELLANT'S SELF-DEFENSE AND DEFENSE-OF-OTHERS DEFENSES.**

The issue is not the <u>admissibility</u> of hearsay. It is rather the <u>definition</u> of hearsay. All parties, including the Son, agree that hearsay is inadmissible. Maryland Rule of Procedure 5-802. Nor is there any quarrel over the basic, and universally accepted, definition of hearsay. Hearsay is an out-of-court assertion offered in court for the truth of the thing asserted. Maryland Rule 5-801(c). "[A]ppellate review of whether evidence is hearsay and, if so, whether it falls within an exception and is therefore admissible is <u>de novo</u>." <u>Hallowell v. State</u>, 235 Md. App. 484, 522, 178 A.3d 610 (2018).

In this case, the out-of-court declarant was Edward Calloway, the ultimate manslaughter victim, now dead. He was speaking to several of his friends and associates as the Son, the auditor of the assertion, approached to within hearing distance. The Son testified that Calloway spoke the words, "This is my block." The State objected on the ground that the words were hearsay. After some wrangling at the bench, the State's objection was sustained. Both the State and the Son now agree that the assertion, "This is my block," was not offered to prove the truth of the thing asserted, to wit, that Calloway enjoyed an entrepreneurial monopoly over the selling of drugs sold in the Monroe-McHenry open-air market. That, of course, is the last thing in the world that the Mother and Son, as entrepreneurial rivals of Calloway, would have wished to prove.

The Son maintains that as non-hearsay, the words spoken were not, <u>per se</u>, inadmissible. He argues that he heard them and that they had an effect on his state of mind

2

as he concluded that Calloway was hostile both to him and to his Mother and that Calloway, therefore, posed a danger to both him and his Mother. Burgess v. State, 89 Md. App. 522, 538, 598 A.2d 830 (1991); Brown v. State, 80 Md. App. 187, 194, 560 A.2d 605 (1989). An appraisal of the admissibility of this particular instance of arguably pertinent non-hearsay depends, of course, upon the context. Banks v. State, 92 Md. App. 422, 434, 608 A.2d 1249 (1992). That context is the entire narrative of the criminal episode now before us.

**A Case Not Of "Whodunnit?"
But Of "Whyhedunnit?"**

The issue before us is a limited one. We are spared the usual Big-W questions of **WHO?, WHAT?, WHEN?,** and **WHERE? WHO?** The appellant, Terrence Belton (the "Son"). **WHAT?** The Son shot and killed Edward Calloway. **WHEN?** December 6, 2018. **WHERE?** The intersection of South Monroe Street and McHenry Street in Southwest Baltimore. Those answers were all undisputed. There remains only the little-W question of **WHY?** This case against the Son posed the single question: **WHY** did the Son kill Edward Calloway?

In appellate brief, the Son advances two reasons for killing Calloway – self-defense and the defense of others, to wit, his Mother. At trial, he offered evidence as to one of those defenses – self-defense. The presence of the other defense – the defense of his Mother – was largely taken for granted, but even its unspoken presence permeated the trial.

**Demythologizing "Mother"**

3

With the only question before the jury being **WHY?**, the Son's apparent answer was that he had no choice but to kill because he was protecting his Mother from the imminent and immediate threat of death. That defense packs a heavy emotional punch. It is this defense of his mother, therefore, that creates the necessity for the following admonitory caveat. Before an appropriately neutral analysis of the hard facts could even begin to emerge, there was a potentially distracting ambience hovering over the trial that had to be dissipated. The intersection of South Monroe Street and McHenry Street was not the Hallmark Hall of Fame. The appellant Belton, however, cast his very presence at that crime scene as the fulfilment of his filial duty to protect his mother in a potentially dangerous and violent environment. That was why he was there. He defended his ultimate shooting of Edward Calloway as necessitated by his defense of others, to wit, his Mother, from the imminent threat of death or serious bodily harm. Those, of course, are exemplary qualities, calculated to engender a sense of juror sympathy.

The Son's arguably dubious guilty verdict of mitigated voluntary manslaughter rather than of unmitigated second-degree murder may almost certainly be attributed to such sympathies in the minds of the jurors. The skimpy factual predicate advanced for this defense of others may, to be sure, have permitted such an extenuated verdict, but the case for it was certainly not compelling. "The homicide victim was, after all, only a dope dealer" (forgetting the inconvenient fact that the mother whose life and limb were ostensibly being protected was also a dope dealer).

In this case particularly we must remove the sentimental stereotype. We must forgo any temptation to think of the appellant Shakiea Worsley as Whistler's Mother[1], calling out from her decrepitude for protection from the slings and arrows of the Monroe-McHenry open-air drug market. Far from being decrepit, the appellant Worsley was a young and vigorous 35-year-old. Two years earlier, she had lost her license to practice as a nursing assistant because of her conviction in the District Court for the unlawful possession of narcotic drugs. She received a suspended sentence. It was then that she turned to selling drugs for a living, heroin and crack cocaine. To put her age in generational perspective, she lived with, and was charged with taking care of, her own grandmother, who was suffering from Alzheimer's disease. We must remember, therefore, that the appellant Worsley in this case was not the grandmother in that household but the granddaughter. In terms of physical prowess, moreover, the appellant Worsley was not the fragile victim of a physical assault, but was unquestionably the initial aggressor (see infra) who actually precipitated the fist-fight with her rival drug dealer that turned into the catalyst for the ultimate killing.

Indeed, just several weeks earlier, the Mother had herself been the victim of a robbery at gunpoint, at night and in an alley just off McHenry Street. Her drugs had been taken from her by force. She did not even report the robbery to the police because she did not want to compromise her own drug-selling activity. She did, however, notify her fellow drug dealers. This was why both Calloway and "Nut," a close associate of Calloway, first

---

[1]    James Whistler, "Arrangement in Grey and Black No. 1" ("Whistler's Mother") (1871).

armed themselves. Their guns were deliberately on open display thereafter at the drug market to deter other would-be robbers from interfering with the orderly transaction of their unlawful business. That presumably traumatic incident, moreover, did not deter the Mother from continuing to sell drugs on a daily (nightly) basis.

It finally behooves us to remember that far from being imperiled by slings and arrows, the Mother was herself the source of many of the slings and arrows that randomly pervaded the Monroe-McHenry open-air drug market. She had been a regular drug peddler of heroin and crack cocaine there on a daily (actually a nightly) basis for over two years. She held her own in that largely male-dominated criminal venue for all of those two years.

In making our mental appraisal of the cold hard facts, therefore, we must scrupulously avoid looking at the scene through the sentimentally distorting lens of James Abbott McNeill Whistler or of Norman Rockwell or of Currier and Ives. We must appraise the legal status of the two co-appellants essentially as if they were unrelated. The Son may have been in league with his Mother but he was not protecting a helpless Old Lady from harm. It was not Whistler's Mother selling drugs on South Monroe Street. In advancing his claim that he acted in defense of his Mother, the Son must not be suffered the benefit of an unexamined but powerful stereotype.

### The Mother's Narrative

A large part of the total narrative and all of the narrative of events prior to the early morning of December 6, 2018, came directly from the testimony of the Mother, who took the stand in her own defense. As of December 6, she was, as we have mentioned, a 35-

year-old woman living at 1607 Lorman Court with her own grandmother. 1607 Lorman Court is but a four or five minute drive from the intersection of South Monroe Street and McHenry Street. She had at one time worked as a geriatric nursing assistant but lost her job in nursing because of her conviction for possessing drugs. It was then that the Mother turned to selling narcotic drugs. From the beginning of her new career as a drug peddler, her regular work venue was the Monroe-McHenry open-air drug market. Her daily (nightly) regimen typically began at or shortly after 11 P.M. She regularly punched out at approximately 7 A.M.

The homicide victim, Edward Calloway, was a rival drug seller in the same Monroe-McHenry open-air market. As of December 6, the Mother had known Calloway since at least the previous "July or August." She referred to him as "Cally." Her nickname was "Kia." Asked about her relationship with Calloway, she described it as "pretty cool in the beginning." She described the drug market generally as an "open market" where "anybody can come and pretty much sell anything." She testified that her interaction with Calloway was on a regular daily basis. At the open-air drug market, Calloway was frequently accompanied by his associate and co-worker, "Nut."

Focusing in on the early morning of December 6, the Mother had first arrived at the drug market at approximately 2 A.M. Calloway was there, "drinking, smoking, selling drugs." According to the Mother, he appeared to be "very intoxicated." Calloway was also "more agitated than usual." Asked whether she and Calloway were involved in an argument, the Mother replied, "Not really. I mean, a couple, but not nothing that wasn't

7

unusual. But, yeah, we had a couple of arguments." She confirmed that it was not the first time that she and Calloway had had arguments. That argument was at about 2 A.M. or 3 A.M. No fight of any sort ensued. The Mother left the Monroe-McHenry market area briefly at about "daylight." The Mother had been approached by a customer who wanted Percocet and the Mother did not carry it. The Mother, however, drove the customer to her home on Lorman Court. She explained, "I drove to my house because my cousin was in there. And he sold Percocet."

It was at that point, approximately 7 A.M., that the Son, the appellant Belton, first enters the narrative. That day, December 6, just happened to be the fifth birthday of the Mother's granddaughter. The little girl whose fifth birthday was pending was the only child of the Son and the only grandchild of the Mother. On the return to the Monroe-McHenry drug market, therefore, the Son rode along so that he and the Mother could go and buy cupcakes to deliver, along with the granddaughter, to the granddaughter's Headstart program at 8 A.M. At this point, the Mother had a busy agenda:

> So I had to take the gentleman that was with me back down to Monroe and McHenry. And I also had to meet somebody, you know, to sell drugs to them. So <u>my son rode with me because he was going to go with me anyway, you know, to take my granddaughter to school</u>.

(Emphasis supplied.)

It will be noted that at that point there had been no suggestion that the Son was accompanying the Mother to protect her from any special danger of violence looming at her regular place of self-employment. The Son was not riding shotgun, except in retrospect. The initial focus was on cupcakes, not Calloway. On later cross-examination, the Mother

8

insisted that her Son had not accompanied her to the Monroe-McHenry open-air drug market on December 6 for her protection but only to get cupcakes for her granddaughter's 5th birthday:

> A. No, <u>it was supposed to be a quick stop. We actually were going to the Head Start to take my granddaughter cupcakes. Like I said, it was her birthday</u>.

(Emphasis supplied.)

In any event, the Mother, the Son, and the Percocet customer arrived back at the Monroe-McHenry drug market at between 7 A.M. and 7:15 A.M. When asked if Calloway was present, the Mother testified, "He had left before me…He was already gone." The Mother then met her scheduled customer. She explained that a store, the Best Crabs located at 1850 McHenry Street, is regularly utilized by the drug dealers to facilitate their trade:

> Q. Was it typical to use that store for drug dealing?
> A. Yes

The Mother explained, "I went in the store, got out what I had to get for the person that I was getting it for." It was also in that store, "in the corner by the door, on the ledge," that Calloway routinely kept a gun. It was as the Mother, who had then finished her sales for the day, was preparing to leave the scene, that Calloway returned.

### The Son's Narrative

The narrative is now supplied by both the Mother and the Son, who also testified in his own defense. It was at this point, moreover, that the preliminary hand-to-hand combat broke out that became the final catalyst for the fatal shooting. It was that preliminary

outbreak of violence that was proffered by the Son as his justification for or, at the very least, extenuation of the fatal shooting.

On the question of why the Son was even with the Mother at the Monroe-McHenry drug market on the morning of December 6, the Son's testimony differed widely from that of the Mother. The Mother's testimony, of course, was that after she had briefly finished up her drug-selling business by returning the Percocet customer to his car and making her scheduled sale to yet another customer, she and her Son were scheduled to go and buy cupcakes for her granddaughter's (his daughter's) fifth birthday and then drive the granddaughter and the cupcakes to her Headstart program by the school's 8 A.M. convening hour. The Son, however, made no mention of the cupcakes or of his daughter. The Son gave his reason for accompanying his Mother to work: "Just to make sure she's okay." He further explained:

Q.     Why do you feel the need to make sure your Mom's okay?

A.     It's South Baltimore. It's a violent area. It's a drug shop.

(Emphasis supplied.) In his mind at least, he was riding shotgun. Advertently or inadvertently, a predicate was being laid for the defense of others defense.

In any event, at approximately 7 A.M. the Mother, having earlier left the drug market, had returned to the scene. Calloway had also temporarily left the scene and he returned minutes after the Mother returned. He was in an agitated state and he took obvious umbrage at the very presence of the Son. That is when he made to several of his friends and associates the angry comment, "This is my block." He walked right up to the Son with

10

the challenging confrontation, "Do you want some smoke? Why did you come down here?" At that point, Calloway had his gun out. The Son attempted to de-escalate the encounter by suggesting that the disagreement, whatever it was, was not severe enough to call for gunplay but could be resolved by a non-lethal fistfight. The Son explained:

A. I'm trying to sort of de-escalate him, like, because I'm not aware of what's going on. But <u>I don't want to show too much fear</u> because he might go a little farther, you know, like, physically touch me or physically touch her.

Q. Okay

A. <u>So I tell him, like, it's not that serious. Like, we can just fight.</u>

Q. And when you say, we can just fight, what do you mean?

A. Meaning, like, whatever it is that's going on, I'm not willing to go that far.

Q. <u>When you say, we can just fight what do you mean by fight? You mean physically fight?</u>

A. <u>Like, fistfight. Fistfight.</u>

(Emphasis supplied.)

Instead of shooting it out, they would duke it out. Calloway apparently agreed and he handed over the gun that he had been brandishing to Nut, who was, in effect, acting as his second. The Son, who was also armed, however, did not turn over his gun to anyone. The Son quoted Calloway, "He says, okay, we can fight." The Son walked up McHenry Street away from the Best Crabs grocery store:

A. Well, I guess, after everybody came to a conclusion, like, okay, this is going to be a petty fistfight, <u>I started to walk away, taking my jacket off, thinking we going to fistfight.</u>

Q. Okay. So you walked away. Do you remember where you walked?

11

A.    I walked up McHenry –

Q.    Okay.

A.    -- away from the grocery store.

Q.    Okay. And where did your mother go?

A.    Sort of watching Calloway.

Q.    And where did Cally go?

A.    Into the store.

(Emphasis supplied.)

As the Son was engaging in the leisurely preparation of shedding his jacket and hoodie (it was December), however, he was "frantically" summoned back with the unexpected news that the fight had started without him, his Mother taking his place on the fight card. Nut informed him, using the words, "They're fighting." The Son put his own spin on the words, "Nut informed me that my mother was being physically assaulted." (Emphasis supplied.) That's more than spin. That is centrifugal fury. Far from being "physically assaulted," the Mother was actually the initial aggressor. The Son's attention at that juncture, however, focused on Nut, who had removed from his pocket the gun that had been turned over to him by Calloway and was holding it in his hand. The fight between his Mother and Calloway was largely obscured from the Son's view by a crowd of onlookers that had begun to gather. At one point, the crowd started to back up.

12

The Mother's role as the initial aggressor could not have been more clear. On cross-examination by the State, she openly acknowledged her precipitating role in that initial fight:

> Q.   Now, it's your testimony that, when you followed the victim to the front of the store, <u>you actually were the initial aggressor, right? You swung on him? You threw a punch at him, right?</u>
>
> A.   <u>Yes.</u>

(Emphasis supplied.) She elaborated:

> A.   No, <u>his back was to me. When he walked in the store and I was behind him, his back was to me. Soon as he turned around, I swung.</u> As soon as he turned around. <u>I didn't wait,</u> I didn't look, I didn't do anything. <u>My maternal instinct said fight him and keep him away from your son.</u> So that's what I did.

(Emphasis supplied.)

The Son hurried toward the site of the ongoing fight. Although he did not see a gun, the Son inferred that Calloway probably had a gun, because the crowd was "a bunch of grown men" and a "fistfight wouldn't scare someone that bad." From that backing up of the crowd, the Son launched into a leap of logic that sounded in self-defense but did not remotely suggest a defense of others:

> A.   <u>It made me think he had a gun</u> –
>
> Q.   Okay.
>
> A.   -- <u>and that he was coming for me in a hostile manner.</u>
>
> Q.   <u>Why would them backing up like that make you think a gun was out?</u>
>
> A.   <u>Because he just pulled the gun out on me.</u>
>
> Q.   He, who?

13

A.     Mr. Calloway.

(Emphasis supplied.)

The Son's conclusion of the necessity for self-defense, moreover, then proceeded not from the actual behavior of Calloway but from the Son's assessment of Calloway as a human being:

A.     So, of course, I'm not going to give him that opportunity to shoot me –

Q.     And –

A.     --if he's already aggressive and coming.

Q.     So, in that moment, what – what was your thought?

A.     I don't want to get shot.

Q.     Okay. And why did you think you were going to get shot?

A.     Because –

Q.     Because of what he was –

A.     --he's already – he's already aggressive, he's already up here, like.

Q.     What do you mean by that?

A.     Meaning, he's at a point. It's not reasoning with him at this point.

Q.     So what happened next?

A.     I shot him.

Q.     And how many times did you shoot?

14

A.    <u>I just kept shooting until he dropped the gun.</u>[2]

(Emphasis supplied.)

When explaining his reasons for firing at Calloway, the Son never mentioned his Mother nor said anything about her possible peril or endangerment. When asked about any injuries to his Mother, he replied:

Q.    Okay. And <u>did you observe any injuries on her?</u>

A.    <u>When we got home</u>, yes. <u>She had</u>, you know, <u>little bruises on her face and stuff like that</u>.

(Emphasis supplied.)

Injuries to his Mother that the Son first noticed some ten or fifteen minutes after the shooting and only after the Son and the Mother had reached the sanctuary of home do not, of course, supply a justification for or even an extenuation of the shooting. The Son never indicated that he even saw her in actual hand-to-hand combat with Calloway.

### The Mother As The Initial Aggressor

The Mother testified that as she and Calloway were first in contact that morning, Calloway brushed past her and assumed a confrontational posture in front of her son. Calloway and the Son knew each other, but "They were not friends." The Mother actually indicated that she did not want her son down there in such a potentially violent area. "If I had my way, he'd have never been out there. He has a tendency to pop up and do all types of things." When asked, "But you didn't want him down there?," the Mother replied, "No."

---

[2]    At trial, no discussion ever came up about whether the Son, even in self-defense, had been guilty of a use of excessive force. The Son was never asked why he felt it necessary to shoot Calloway five times.

15

On this occasion, Calloway challenged the Son with the question, "Do you have a problem?" As the Son and Calloway faced off against each other, the Mother became aware that, ostensibly, there was going to be a fistfight between the two:

> Q. <u>Does it appear there's going to be a fistfight?</u>
>
> A. <u>It was supposed to have been, yeah</u>. He handed his gun that he had when he got out of the car to Nut.

(Emphasis supplied.)

Cannily, the Mother was aware that even though Calloway had handed over his gun to Nut, Calloway still had another gun available nearby, stashed immediately inside the door of the Best Crabs grocery. As the Mother then observed Calloway not walking toward her Son, who was taking off his jacket on McHenry Street, but instead walking toward the store, she followed him. Her tactical appraisal of the situation was clear:

> So when I noticed that <u>he wasn't walking towards my son</u>, while my son was taking off his jacket, <u>he was going to the store, my first thing that kicked in was my maternal instinct. If he's going to fight, why is he walking towards the store instead of towards my son. So I followed him.</u>

(Emphasis supplied.)

As the Mother then followed Calloway into the store, his back was to her. As soon as he turned around, she, as the undisputed initial aggressor, started swinging at him:

> <u>As he's walking in the store,</u> of course <u>his back is towards me</u>. So I see him fumbling for something. <u>So when he turn around, first thing I'm thinking about is the gun</u>. I know it's only – I only seen one. And that's the one that he handed to Nut. So I'm, like, it's another gun over there. <u>So as soon as he turned around, I just started swinging, to prevent him from getting anywhere near my son. I'd rather just fight him myself</u>.

(Emphasis supplied.)

16

As the fight then "rolls out into the street," the Mother soon is "getting beat up pretty bad." The fight became a blur. The Mother's image of the fight was:

> A.    That part, after – <u>everything after this is kind of a blur. I know that we were fighting and we was on the ground. At one point, I'm still on the ground and he's not there.</u>
>
> Q.    When you say he's not there –
>
> A.    <u>Cally gets up. So when he gets up, he end up coming back. And he's on top of me again. But at this time I'm not knowing that he's shot yet, because I heard the gunshots. But I still didn't know he was shot because he was right there and I'm right there. I'm not shot. How is he shot? So when he fell on me, I got up and just went to try to get my</u> – some type of way – <u>I don't know if he was holding my leg, my arm, my coat, or whatever. And I heard him say, "This bitch shot me."</u> But he never said who. <u>He just said, "This bitch shot me."</u>

(Emphasis supplied.)

The Mother's testimony about her fight with Calloway itself and about the shooting also cast doubt on the Son's testimony that Calloway was walking toward him with gun in hand when the Son deemed it necessary to shoot Calloway in self-defense. According to the Mother, Calloway was on top of her, physically fighting. At one point he stood up. Briefly thereafter, he fell back on top of her, asserting, "The bitch shot me." It is highly improbable that Calloway would have walked away from his tussle with the Mother, walked even a short distance up McHenry Street in a fight with the Son, been shot five times, and then returned (or even to have been able to return) to the spot of the original tussle to fall on top of the Mother, asserting, "The bitch shot me." Calloway obviously believed that he had been shot by the Mother in the course of their fight and not by the Son.

17

No gun was ever recovered at the crime scene. No empty shell casing was ever found other than the five that were traceable to the Son's gun.

This testimony by the Mother also tends to belie the Son's version of his final confrontation with Calloway, immediately before he opened fire. If the Son and Calloway had been staring each other down, as if in a classic Dodge City face-off, Calloway would have known full well who shot him. He would not have collapsed, fatally wounded, on the Mother's body and cried out in shocked surprise, "The bitch shot me." He reacted as if the Mother had somehow pulled a gun on him as they were wrestling on the ground and hitting each other with their fists. The Mother neither knew who was shooting nor who got shot. She immediately got in her car and left the scene:

> Q.   --at the time you heard the gunshots, did you know who was shooting?
>
> A.   No.
>
> Q.   Did you know who got shot?
>
> A.   No. I didn't know until he said, "This bitch shot me." Because everything just happened so fast. And from where I was at on the ground, in front the – in front of the store, I couldn't see on the side of, you know, McHenry, where the shooting was coming from. I couldn't see that.
>
> Q.   Okay. So once you got up, what'd you do?
>
> A.   Got straight in my car and pulled off.
>
> Q.   Okay, Where'd you go?
>
> A.   Home.
>
> Q.   Why'd you go home?
>
> A.   It was just a shooting. I'm shook up, I'm beat up, I'm terrified. I don't know what to do next. I'm just scared.

18

Q.     And <u>you obviously drove your son as well</u> –

A.     <u>Yes</u>.

Q.     -correct? <u>Why didn't you tell him to get out of the car?</u>

A.     <u>Well, first and foremost, I didn't know anything until I got home</u>.

(Emphasis supplied.)

It was only after they arrived at home that the Son told the Mother that he had been the shooter. This will obviously be of great significance when our analysis turns to the Mother's role as an accessory after the fact.

## A Non-Issue:
## The Defense Of Others

Only the Son, of course, could tell us what his reason was for shooting Calloway. Having examined every syllable uttered by him as his reason for opening fire on Calloway, we can now confidently eliminate from any further consideration on this appeal the perfect defense of others or the imperfect defense of others. To be sure, as the trial started the rough framework of the script, the cast of characters, and the close mother-son relationship between two of the three leading characters gave every promise that the defense of others might play a significant role in the final analysis. The testimony of the Son, however, completely eliminated any concern for his Mother's possible danger as his express motivation for shooting Calloway. From the start to the finish of his testimony, he articulated his need for nothing but self-defense. The actual evidence simply did not generate any issue with respect to the defense of others.

19

In this case, there was clearly no viable issue generated with respect to the defense of others. If our declination to give any further consideration to an issue that was, without objection, submitted to the jury as a justiciable issue, is considered questionable, however, let us hasten to point out that the elimination of this issue will have no net adverse impact on the fortunes of the Son. His only contention is that when the non-hearsay fragment "This is my block" was ruled to be inadmissible, that had an adverse impact on his two claims of defense, self-defense and the defense of others alike. Self-defense very definitively remains before us for our consideration. Any arguable impact on the defense of others would also have had, ipso facto, an indistinguishable impact on self-defense. Any prejudice, therefore, would have been redundantly harmless.

### The Defense Of Others: The Role Played By The "Other"

In addition to the Son's silence as to such a motive for the shooting, the role of the Mother as the initial aggressor in her fistfight and further scuffle with Calloway is an additional reason why the Son's claim of defense of others, to wit, his Mother, had absolutely no viability as an issue generated by the evidence as a question for the jury. The doctrine of the defense of others contemplates intervention on behalf of an innocent victim and not intervention on behalf of an initial aggressor or even on behalf of a mutual combatant.

In Shuck v. State, 29 Md. App. 33, 349 A.2d 378 (1975), the first and only Maryland case ever to deal with the imperfect defense of others, Shuck was deemed to be entitled to intervene on behalf of a companion who was engaged in a potentially deadly conflict with

20

two other persons. The opinion pointed out, however, that the companion was under unprovoked attack and had been neither an aggressor nor a mutual combatant. In this particular encounter on South Monroe Street, by contrast, how could the Mother possibly qualify for the defensive assistance of the Son, or of anyone? How could the Son be legally entitled to intervene in an encounter by lending assistance to the initial aggressor or even to a mutual combatant in that encounter? As R.M. Perkins and R.N. Boyce, <u>Criminal Law</u>, (3d ed. 1982), Ch. 10, Sec. 5, "Defense of Another," 1146, makes clear:

> <u>If two are engaged unlawfully in a mutual fight (deadly or nondeadly) the law does not authorize anyone (close relative or stranger) to take sides in the contest</u> and aid one in the effort to overcome his adversary…[o]bviously the law does not authorize anyone to join forces with the offender and aid him in harming the innocent victim.

(Emphasis supplied.) The undisputed status of the Mother as the aggressor in her fistfight with Calloway absolutely disqualified that scuffle as an event in which the Son would have been entitled to intervene in ostensible defense of his Mother.

If that disqualification of the defense of others were not enough, there is yet a further disqualification. The Son does not deign to suggest how he would have been entitled to intervene at a deadly level in defense of his Mother who was engaged in only a nondeadly conflict. Even if he could have charged into the fray with fists flying, he could not have charged in with guns blazing. He could not escalate that confrontation from the non-deadly to the deadly level. In virtually every conceivable respect, therefore, the Son's defense of others defense was simply not a viable issue to be submitted to the jury. At trial, however, no one even mentioned these inherent and obvious inadequacies as the issue was, indeed, submitted to the jury.

21

**Autopsy And Ballistics**

Dr. Donna Vincente, the Assistant Medical Examiner who performed the autopsy on Calloway, testified that Calloway died as a result of five gunshot wounds. All shots were fired from more than three feet away, because there was no evidence of stippling surrounding any of the wounds. Gunshot A entered the right side of Calloway's upper back, nicking the spinal column, and then penetrating the left lung. That bullet was recovered. Gunshot B entered Calloway's right lower back injuring the duodenum, the stomach, and the liver before exiting the right upper abdomen. The trajectory of that bullet was upward. Gunshot C pierced the right side of Calloway's stomach. That bullet was also recovered. It ultimately fractured the right side of Calloway's backbone. Gunshot D struck Calloway on the back of Calloway's right hand. Gunshot E was a through-and-through wound of Calloway's right thigh. The very positioning of Gunshot A and Gunshot B tend strongly to negate the Son's testimony that Calloway was on his feet and walking toward him when he deemed it necessary to fire in self-defense. If that were the case, how did the bullets enter Calloway's back?

When the police arrived at the crime scene a few minutes after the Mother and the Son had left, Calloway was gravely wounded but still alive. He was transported to the emergency room at the Maryland Shock Trauma Center. It was a little over 24 hours later, at 10:03 A.M. on the next day, December 8, 2018, that he was pronounced dead.

On December 19, 2018, the police executed a search warrant at 1607 Lorman Court. Recovered from a hallway linen closet was a .45 handgun. A subsequent ballistic examination showed that the two bullets recovered from Calloway's body, one bullet

recovered from the crime scene, and five shell casings recovered from the crime scene had all been fired from that .45 handgun. The Son, of course, fully acknowledged that he was the shooter.

## Perfect Self-Defense

Although the defense of others (perfect or imperfect) was not generated as a viable issue in this case, self-defense (both perfect and imperfect) was more arguably a viable issue. At least one element of self-defense – the shooter's fear that he was in imminent danger of death – was at least fully litigated. In cases of criminal homicide, what is now called the doctrine of self-defense was a recognized justification for a homicide almost as ancient as the common law itself. Under precisely the circumstances that would constitute perfect self-defense today, the homicide was early on deemed to be an instance of justifiable homicide. In Dykes v. State, 319 Md. 206, 211, 571 A.2d 1251 (1990), Judge Orth laid out for the Court of Appeals the four necessary elements for a complete and perfect case of self-defense; the complete paradigm:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

See also State v. Faulkner, 301 Md. 482, 485, 483 A.2d 759 (1984); Tichnell v. State, 287 Md. 695, 718, 415 A.2d 830 (1980); DeVaughn v. State, 232 Md. 447, 453, 194 A.2d 109

23

(1963); <u>Bruce v. State</u>, 218 Md. 87, 96-97, 145 A.2d 428 (1958); <u>Guerriero v. State</u>, 213 Md. 545, 549, 132 A.2d 466 (1957).

With respect to self-defense, the initial burden of production, to wit, the burden of generating a <u>prima facie</u> jury issue, is cast on the defendant. As Chief Judge Robert C. Murphy explained for the Court of Appeals in <u>State v. Evans</u>, 278 Md. 197, 208, 362 A.2d 629 (1976):

> The <u>burden of initially producing "some evidence"</u> on the issue of mitigation or self-defense (or of relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to those defenses <u>is properly cast upon the defendant</u>.

(Emphasis supplied.) That is the burden to produce a <u>prima facie</u> case as to each and every factor of the multi-factored self-defense paradigm. There is obviously more to the multi-factored paradigm of self-defense than the first factor.

Once the defendant has generated a genuine jury issue with respect to self-defense, however, the burden shifts to the State to disprove self-defense beyond a reasonable doubt. That means that the State needs to persuade the jury beyond a reasonable doubt that at least one of the four constituent elements of self-defense did not exist. To demolish one of the defendant's necessary constituent elements, however, is, <u>ipso facto</u>, to demolish the entire defense. Although the submission of the defense to the jury puts the State behind, the State does get to bat last.

In this case, the testimony of the Son was treated as having generated a jury issue as to self-defense. The jury was accordingly instructed by being given Maryland Criminal Pattern Jury Instruction, Sect. 4:17.2. Before the jury the State did not utterly succeed in its demolition mission. Had it done so and had the defense of self-defense thereby been

24

completely rejected, the Son's verdict would have been one of guilty of murder in the second degree. It was not. On the other hand, neither did the State fail utterly in its attack on the elements of self-defense. Had it so failed and had the defense of self-defense survived completely unscathed, the Son would have been completely exonerated. He was not. The intermediate verdict of guilty of manslaughter brings us to a relatively new, or at least newly recognized (45 years), set of intermediate defenses.

### A Dramatic Appellate Chapter:
### The Recognition of the Imperfect Defenses

The imperfect defenses generally – imperfect self-defense, imperfect defense of others, imperfect defense of habitation, imperfect duress, and imperfect necessity – were a venerable but relatively arcane wrinkle of the early common law of criminal homicide. If a defendant genuinely believed that his use of force was necessary to defend his life or limb (or to serve another of the other four purposes), but his belief was deemed to be objectively unreasonable, he was still guilty of a felonious homicide. For punishment purposes, however, his moral blameworthiness was extenuated downward, not completely but to a degree. In the language of the common law, his lack of "malice aforethought" mitigated or lessened his degree of blameworthiness. As we have noted, however, this was a relatively obscure and arcane wrinkle of English common law that arrived in the colony of Maryland as part of the unseen cargo of the Ark and the Dove in 1634. It is not surprising, therefore, that the Maryland courts were oblivious to its presence for almost the first 350 years of their existence. In the figurative cargo holds of the Ark and the Dove, such arcane wrinkles as the imperfect defenses were not that visible.

25

Credit for first recognizing the very presence of those inherent wrinkles in our Maryland common law is due to the then newly created Court of Special Appeals in 1975. Stimulated by the Supreme Court decision in <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court of Special Appeals undertook in <u>Evans v. State</u>, 28 Md. App. 640, 349 A.2d 300 (1975), <u>aff'd</u> <u>State v. Evans</u>, 278 Md. 197, 362 A.2d 629 (1976), to survey and reexamine the entire history of homicide law in Maryland and before that in England. At 28 Md. App. 658, n.4, <u>Evans</u> recognized and briefly discussed the imperfect defenses as an inherent part of the Maryland common law even though they had never theretofore been expressly applied in a Maryland case.

Over the course of the next nine years and in a series of no less than six cases, the Court of Special Appeals campaigned for the official recognition of the theretofore neglected imperfect defenses. <u>Shuck v. State</u>, 29 Md. App. 33, 40-45, 349 A.2d 378 (1975), <u>cert.</u> <u>denied</u>, 278 Md. 733 (1976) (imperfect defense of others); <u>Wentworth v. State</u>, 29 Md. App. 110, 120-21, 349 A.2d 421 (1975), <u>cert.</u> <u>denied</u>, 278 Md. 735 (1976) (imperfect duress); <u>Law v. State</u>, 29 Md. App. 457, 463-65, 349 A.2d 295 (1975), <u>cert.</u> <u>denied</u>, 278 Md. 726 (1976) (imperfect defense of habitation). *See also* <u>Cunningham v. State</u>, 58 Md. App. 249, 253-54, 473 A.2d 40, <u>cert.</u> <u>denied</u>, 300 Md. 316, 477 A.2d 1195 (1984) (imperfect self-defense).

When <u>Faulkner v. State</u>, 54 Md. App. 113, 458 A.2d 81 (1983) was before the Court of Special Appeals, Judge Orth (specially assigned, former Chief Judge of this Court, later Judge of the Court of Appeals) re-confirmed this Court's recognition of the imperfect

defenses but noted, 54 Md. App. at 115, that the Court of Appeals had not yet addressed the matter. In our Faulkner, Judge Orth wrote:

> Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. Imperfect self-defense, however, requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so. If established, the killer remains culpable and his actions are excused only to the extent that mitigation is invoked.

(Emphasis supplied.) 54 Md. App. at 115.

In affirming the decision and the opinion of this Court, the Court of Appeals in its State v. Faulkner, 301 Md. 482, 483 A.2d 759 (1984) fully accepted the notion of imperfect self-defense. In a thorough historic review, it fully acknowledged the antecedent efforts by this Court in recognizing the long neglected wrinkles of the common law of criminal homicide. Faulkner then expounded imperfect self-defense, 301 Md. at 500-01; laying out its full paradigm:

> A proper instruction when such evidence is present would enable the jury to reach one of several verdicts: (1) if the jury concluded the defendant did not have a subjective belief that the use of deadly force was necessary, its verdict would be murder; (2) if the jury concluded that the defendant had a reasonable subjective belief, its verdict would be not guilty; and (3) if the jury concluded that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances, then its verdict would be guilty of voluntary manslaughter. The reason courts have reached the third conclusion is that the conduct of the defendant in these circumstances negates the presence of malice, a prerequisite to a finding of murder, but the defendant is nevertheless to blame for the homicide and should not be rewarded for his unreasonable conduct.

(Emphasis supplied.) *See also* Moylan, Criminal Homicide Law, (2002), Chapter Ten, "The Imperfect Defenses," pp. 191-93 (Maryland State Bar Association, MICPEL)

27

In Dykes v. State, 319 Md. 206, 571 A.2d 1251 (1990), the Court of Appeals reaffirmed State v. Faulkner and then elaborated on one of its most important procedural problems, that of what a defendant must do to generate a jury issue on self-defense (perfect or imperfect). Dykes explained:

> Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says – "some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

(Emphasis supplied.) 319 Md. at 216-17. That threshold question of whether the issue has been generated is one for the trial judge as a matter of law:

> The threshold determination whether the evidence was sufficient to generate the doctrine of self-defense was a question of law for the judge.

319 Md. at 221. (Emphasis supplied.)

## Imperfect Self-Defense

Of the four conditions that constitute the paradigm of perfect self-defense, two of them require a reasonable belief on the part of the defendant. The defendant must have a reasonable belief that he was in imminent danger of death or serious bodily harm. The defendant must also have a reasonable belief that the force he employed was necessary to meet the danger. If the defendant actually possessed each of these beliefs subjectively but the jury believed that such belief in either case was unreasonable, that would constitute a

28

case of imperfect self-defense. In State v. Marr, 362 Md. 467, 474, 765 A.2d 645 (2001),

Judge Wilner explained:

> Unlike its "perfect" cousin, "imperfect" self-defense, if credited, does not result in an acquittal, but merely serves to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter. As we explained in Faulkner and repeated in Dykes, a defendant who commits a homicide while honestly, though unreasonably, believing that he/she is threatened with death or serious harm and that deadly force was necessary does not act with malice, and, absent malice, cannot be convicted of murder. Nonetheless, because the killing was committed without justification or excuse, the defendant is not entitled to full exoneration and would be guilty of voluntary manslaughter.

(Emphasis supplied.)

State v. Marr also offered guidance as to how to measure the elusive quality of

reasonableness:

> Our jurisprudence, pre-dating Faulkner, is consistent with an objective, rather than a subjective, standard of reasonableness. It has always been a requirement of "perfect" self-defense in Maryland that the defendant's belief of imminent death or serious bodily harm and the need to respond with the amount of force used coincide with that which would have been entertained under the same circumstances by a person of average prudence. We made clear in Faulkner that not only must the defendant subjectively believe that his actions were necessary but objectively, that a reasonable man would so consider them.

(Emphasis supplied.) 362 Md. at 479-80. *See also* Porter v. State, 455 Md. 220, 230-36,

166 A.3d 1044 (2017); State v. Smullen, 380 Md. 233, 250-53, 844 A.2d 429 (2004).[3]

---

[3]     One interesting nugget of self-defense law (perfect and imperfect) that was not touched on in this case is an aspect of the necessary belief that no more force was used then was necessary. That factor includes the duty to retreat. As is pointed out in Porter v. State, 455 Md. 220, 235, 166 A.3d 1044 (2017):

> Additionally, when a defendant uses defensive, deadly force outside of his home, he has a duty "to retreat or avoid danger if such means were within his power and consistent with his safety."

**The Alleged Significance Of The Verbal Fragment**

In this labyrinthine maze of perfect and imperfect defenses, what was the significance of the four-word outburst, "This is my block." It was, of course, an assertion made out of court by the declarant Calloway. The out-of-court auditor who heard the assertion was the Son. It was the Son who offered the assertion in Court. The State objected on the ground that the assertion was inadmissible hearsay. The court sustained the State's objection. We agree with the Son that the assertion was not hearsay. It was certainly not offered for the truth of the thing asserted, to wit, that Calloway was licensed, presumably by the City of Baltimore, to exercise a monopolistic privilege to sell contraband narcotics at the intersection of South Monroe Street and McHenry Street. If not that, however, for what purpose was the assertion offered?

The Son, who offered the assertion, claims that he offered it to show the effect that hearing it had on his mind. Calloway sold drugs at that intersection. The Mother, who also sold drugs at that intersection, was Calloway's entrepreneurial rival. When Calloway returned to the intersection on the morning of December 6 and saw both the Mother and her Son there, both his attitude and his words revealed his animus against the Mother, and vicariously against the Son, as entrepreneurial interlopers. When pressed to explain the relevance of his state of mind, the Son explained that when the interaction between his family and Calloway turned ugly and potentially violent, the words "This is my block" helped to convince him of Calloway's animus against Mother and Son and, therefore,

---

(Emphasis supplied.) *See also* <u>Burch v. State</u>, 346 Md. 253, 283, 696 A.2d 443 (1997).

Calloway's potential for violence against them. It was this, he further explained, that caused him to fear that he was in imminent danger of death or serious bodily harm. It was this inherent animus, he further explained, that made his fear of imminent death ultimately reasonable.

We agree with the Son that the words, "This is my block" were relevant on that issue of Calloway's animus. We further agree that Calloway's animus was, in turn, relevant on the issue of the Son's assessment of Calloway's hostile intent. The ultimate question, however, will be not the issue of "Relevance?," but the issue of "How much relevance?" Was the verbal fragment pivotal or was it, even if relevant, relatively inconsequential?

Critical to the Son's defense of self-defense was the question of whether Calloway's actions immediately prior to the shooting created in the Son the fear that he was, indeed, in reasonable danger of imminent death or serious bodily harm. The jury rejected the Son's claim that, under all of the circumstances, such a fear on his part was reasonable. That rejection of his theory of perfect self-defense is why the jury did not exonerate him of all guilt for the criminal homicide. On the other hand, the jury obviously accepted the Son's testimony that he genuinely and subjectively harbored such a fear even if it was not reasonable. Accordingly, the jury extenuated the Son's degree of blameworthiness from one of second-degree murder down to one of manslaughter. The Son received the mitigating benefit of imperfect self-defense.

Not ultimately mollified by that boon, the Son now contends that had the jury heard the words "This is my block," they would probably have agreed that the Son's subjective fear was also objectively reasonable. He contends that this error in the admissibility ruling

31

was responsible for the lesser verdict in his favor based on imperfect self-defense instead of a fully exculpatory verdict of not guilty based on perfect self-defense. That is the nub of the Son's case.

## Don't Neglect The Procedural Signposts

A bolstering of one of the self-defense factors would be immaterial, however, if at least one other self-defense factor failed. The State only has to knock out one part of the paradigm. It does not have to knock out the entire paradigm. If the claim of self-defense were to fail for some other reason, nobody would care whether the Son's fear of Calloway was reasonable or unreasonable.

In examining self-defense (as well as in examining the defense of others), our job is more difficult in this case than it needed to have been because, in several critical areas, we are reviewing a blank, or at least an unmapped, slate. Too much, including which sub-issue was being discussed, was casually taken for granted. The defense blithely treated the two affirmative defenses as being properly before the jury without ever having expressly offered them as issues that had been generated by the evidence. The State, for its part, never challenged whether either defense had actually been generated by the evidence. The trial court, accordingly, was never called upon to make express rulings with respect to either defense or with respect to specific sub-issues. There was no debate, factor by factor, with respect to each factor of the multi-factored paradigm. Questions such as who was the initial aggressor or what did the duty to retreat consist of never arose. The underlying facts, to be sure, were fully developed. Those underlying facts, however, were never assigned to a

clearly defined sub-issue or category. The court simply announced that the ultimate issue had been generated and would be submitted to the jury.

We are, therefore, adrift in facts but missing the reassuring procedural signposts. The necessary procedural steps that those facts would lead to were almost entirely taken for granted. In trying to look at specific key elements of the self-defense paradigm, we are left almost completely to surmise as to which element, if any, was even under analysis.

### The Self-Defense Paradigm As An Indivisible Entirety

The doctrine of self-defense is, of course, multi-factored. It consists of four requirements, each one of which must be satisfied before the doctrine itself can even come into play. The full self-defense paradigm is:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

Dykes v. State, 319 Md. 206, 211, 571 A.2d 1251 (1990).

A frequent problem in a case involving a claim of self-defense, and clearly the problem in the case now before us, is that when all parties obsess over the satisfaction of one or two hotly contested factors, there is an almost inevitable tendency to forget the other factors, sometimes to the point of neglecting them entirely. In order to generate an issue as

33

to self-defense, the proponent of the defense is obligated to produce a <u>prima facie</u> case as to each and every one of the four factors. There is no presumption that a <u>prima facie</u> case has been established with respect to a particular factor simply because that factor has not been hotly contested. On the way around the bases, each base must be carefully touched.

Two of the self-defense requirements consider the belief or the mental state of the defendant. One of those requirements is the belief that the defendant is facing the threat of immediate or imminent death or serious bodily harm. The other required belief is that no more force is being employed in self-defense than is necessary to counteract the danger. There is an additional self-defense requirement that each of the two aforementioned beliefs on the part of the defendant be reasonable.

At the present time, these two factors involving a defendant's belief, especially the first, are enjoying a very high-profile celebrity generally and are being heavily litigated in the State and national caselaw. The reason for their high-profile notoriety is clear. It involves the relatively recently recognized notion of imperfect self-defense or partial self-defense. If the defendant's fear of imminent death, for instance, is deemed to be both subjectively present in the defendant but also to be an objectively reasonable fear, such a showing of perfect self-defense (assuming, of course, that all other factors have also been satisfied) will establish that the homicide was justified and that the defendant will be completely exonerated. If, on the other hand, and this is where so much of the current action is, the defendant's belief is found to be an actual subjective belief on the part of the defendant but is also found to be an objectively unreasonable belief, the defendant is still guilty of criminal homicide but his possession of an actual fear of death (even though

unreasonable) removes the element of malice from the equation and thereby lowers the defendant's degree of blameworthiness from the murder level down to the manslaughter level.

In this case, the jury may have found that the Son possessed an actual subjective fear of death but that that fear, under the circumstances, was not reasonable. That is the reason he was found to be not guilty of second-degree murder but guilty only of manslaughter. It was here, in the gap between an actual subjective belief and the objective reasonableness of that belief that the Son's sole contention is wedged. He claims that the missing four words of non-hearsay "This is my block," had they been heard by the jury, would have persuaded it to find his fear of death had been objectively reasonable. The jury gave him a partial victory with partial self-defense but did not go the whole way. He claims he was entitled to more.

Even if, however, the missing four words could have persuaded the jury to find that the Son's fear of death was reasonable, such a partial victory should have been immaterial unless the Son had also established a prima facie case with respect to the other lower-profile factors of the multi-factored self-defense paradigm. What about the Son's status as a possible aggressor? What about the Son's satisfaction of his duty to retreat? Those other factors do not distinguish between complete satisfaction and partial satisfaction. These other vital factors, significantly, were never put under the Klieg lights of close analysis.

This is why we express chagrin at evaluating the case of self-defense now before us. With respect to such vital factors as aggressor status and the duty to retreat, we are reading an essentially blank slate. In terms of generating a case of self-defense, we do not

35

know whether a critical threshold was crossed, because there was no express threshold. The Son put on a case, such as it was, with respect to his fear of death. He did not put on a case with respect to any other component of the self-defense paradigm. Those lower-profile elements of the self-defense paradigm were simply taken for granted. The State, for its part, never challenged whether the Son had, indeed, generated a legitimate jury issue as to self-defense. This creates its own special legal problem, which will be discussed infra.

**Status As A Non-Aggressor**

In the self-defense paradigm (and in the defense of others paradigm as well), a key and indispensable component is that one claiming the defense shall not have been the aggressor. An initial aggressor does not acquire an entitlement to self-defense because at some point midway during a conflict he suddenly finds himself in immediate threat of life or limb. Such legal status does not call for tactical reevaluation on a round-by-round basis.

Like an NFL referee going under the hood for an instant replay, we must freeze the action and then examine the critical moment on an inch-by-inch and second-by-second basis. For purposes of our examination, the critical moment in this case will be, essentially, the last ten or fifteen seconds before the lethal shots were fired. Our focus will be not on who was responsible for some long-standing grievance. Our focus will be only on who brought on the immediate confrontation that led to Calloway's death. Our emphasis is on the adjective "immediate." Our focus, moreover, is on two people, the Son and Calloway. With the defense of others removed from the equation, the Mother is not a party to the final showdown between the Son and Calloway, mano-a-mano.

At that critical moment under review, Calloway had just been on the ground, wrestling with the Mother. He had just gotten to his feet, turned enough to see the Son rapidly approaching, and had taken perhaps a step or two in that direction, when he was hit by a barrage of five bullets and collapsed on top of the Mother. The Son was advancing on the spot where Calloway was standing.

For his part, the Son was approaching this epicenter from a short distance away. He had been slightly up the McHenry Street side of the intersection. When he heard the report, "They're fighting," he came running (or walking rapidly) toward the spot of that fighting. In any event, he was advancing. He came, moreover, fully armed, his .45 in hand. By contrast, any suggestion that Calloway had a gun is skimpy at best. No gun was found by the police at or near Calloway's body. No spent bullet or empty shell casings from any gun other than the Son's was ever found anywhere in the area. The Mother, who had just been wrestling on the ground with Calloway, never had any reason to believe that he had a gun on him at that point. The Son's conclusion that Calloway had a gun seems to have been essentially based on speculative inferences. One such inference was that when Calloway started to reach for his pocket, the Son concluded that he was reaching for a gun. *But see* Cunningham v. State *infra*. Another such inference was that when the crowd watching the fistfight between the Mother and Calloway moved back, it must have been because they saw a gun. While being shot five times and believing that the Mother had shot him, Calloway, if he had a gun, did not get off a single shot by way of return fire.

Jason Chestnut was one of the witnesses who observed the fight between the Mother and Calloway take place. He testified that the gunshots came from "the McHenry side" of

37

the corner. He further testified that neither Calloway nor the Mother brandished guns. He said that he never saw anyone with a gun. Keon Wright also witnessed the fight between Calloway and the Mother. He never saw Calloway or the Mother with a gun, only the Son. He testified, "So that's when, you know, her son, you know, pulled out the gun and started firing at Calloway."

Let us note again that we are not focusing on who might have been talking aggressively or trash-talking five minutes earlier. We are focusing on who brought on the immediate confrontation that resulted in the shooting. With respect to that immediate confrontation, all of the meaningful evidence and all of the inferences that can be reasonably drawn therefrom, the conclusion is inescapable that it was the Son who was the aggressor. Triggered by the report "They're fighting," <u>it was the Son who advanced</u>, fully armed and with gun in hand, <u>on Calloway and not Calloway who advanced on the Son</u>.

With his palpable failure to produce any caselaw with respect to this critical component of the self-defense paradigm, the Son should not have been entitled to the defense of self-defense. Under those circumstances, whatever happened with respect to the reasonable fear of imminent death component obviously should not have made any difference. Beefing up that factor in the multi-factored paradigm would be immaterial if the entire self-defense paradigm as an entirety were otherwise unavailable.

Let us look, <u>arguendo</u>, at this precise factual scenario through the eyes of Calloway. He rises from the ground after having been attacked by the Mother. He sees the Son moving toward him with a gun in his hand. If he had been charged with making some threatening gesture toward the Son at that point, might not Calloway have had a viable claim of self-

defense? If so, would not any force Calloway exerted against the Son have been thereby lawful force rather than unlawful force? Under self-defense law, one is not entitled to respond to lawful force. We are not suggesting that this hypothetical proposition is necessarily true. We are only lamenting that such a hypothetical proposition was never even mentioned, let alone debated or resolved. We are looking instead at a blank slate. As we move toward the critical moment of decision, who attacked whom? Why did the State not demand an answer to such a question?

There is another possible way of looking at the evidence surrounding the violent confrontation that immediately preceded the fatal shooting. One might consider the Mother and the Son as an indivisible combat unit. Calloway almost certainly thought of them that way. If an NFL referee were to go under the hood for a replay, the critical time for close examination would then be from the outbreak of violence, the beginning of the physical fight between the Mother and Calloway, to the shooting of Calloway. The indisputable initial aggressor of that outbreak of violence would be the Mother-Son combat unit. The Mother's testimony bears repeating:

> So as soon as he turned around, I just started swinging, to prevent him from getting near my son. I'd rather just fight him myself.

(Emphasis supplied.)

If the Mother-Son combat unit were charged with having been the initial aggressor, as it would have to have been, the Son, as an integral member of that combat unit, could not avoid that taint. As an aggressor, he could not satisfy the self-defense paradigm and should have been thereby ineligible even to claim self-defense.

**The Duty To Retreat Versus
Moving To The Sound Of The Guns**

There was yet another factor that was utterly neglected. To advance is the diametric opposite of to retreat. In classic military training the code of the warrior commands, "If in doubt, move to the sound of the guns." To move to the sound of the guns is to advance. It is to advance into the very vortex of the conflict. In the law of self-defense, the command, conversely, points in the diametrically opposite direction. It admonishes, "Move away from the sound of the guns, unless it is unsafe to do so." To avail oneself of the law of self-defense, one must take every opportunity to avoid the deadly conflict.[4] This is a key component of the self-defense paradigm that cannot be blithely ignored. As Judge Wilner explained for the Court of Appeals in Burch v. State, 346 Md. 253, 283, 696 A.2d 443 (1997):

> One of the elements of the defense of self-defense is the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety.

(Emphasis supplied.) *See also* DeVaughn v. State, 232 Md. 447, 194 A.2d 109 (1963); Bruce v. State, 218 Md. 87, 97, 145 A.2d 428 (1958); Corbin v. State, 94 Md. App. 21, 25, 614 A.2d 1329 (1992).

In the doctrine of self-defense, the core fourth component of the paradigm is that the defendant shall not have used more force than was necessary to protect himself from

---

[4]     One prominent exception to this rule is the so-called Castle Doctrine. If one is in one's own home when the threat arises, one may stand one's ground. Outside of one's home, however, the duty to retreat is universal, unless it is not safe to do so. *See* Crawford v. State, 231 Md. 354, 361, 190 A.2d 538 (1963). The Castle Doctrine is not applicable here.

imminent death or grievous bodily harm. Such protection is the only purpose of the law of self-defense. This fourth component of that paradigm recognizes that there may be other ways of achieving that life-saving purpose short of killing the would-be killer. It absolutely requires that the defendant consider those other options and find them to be unavailable before resorting to the extreme option of killing in self-defense. This is what is meant by the command that he exert no more force than is necessary. This does not mean simply two bullets instead of five. It is not simply a quantitative measure. It also means, qualitatively, avoiding bullets altogether if another and more peaceful option is available, such as retreat. In the trial of this case, it appears that this core component of the law of self-defense was not even mentioned, let alone litigated or resolved.

When the Son heard the report "They're fighting," he was on McHenry Street, half a block (or at least a quarter of a block) away. In terms of any fear of immediate or imminent threat to his person, the Son was at that point in no danger. He could have stayed right where he was. A simple about-face would have opened before him all of North and East Baltimore as a vast and open hinterland of asylum with no impediment to his access thereto. It was not unsafe for the Son to retreat. To have some other arguable reason to advance is not a recognized exemption from or satisfaction of the duty to retreat.

When the Son heard the words "They're fighting," he did not retreat. He advanced. He ran or walked rapidly, with his gun out and in his hand, into the very vortex of the conflict, to where his Mother and Calloway were on the ground in front of the Best Crab store. In military language, he "moved to the sound of the guns." He moved toward the

danger, not away from it. Whatever else this may have been, this advance was not a satisfaction of his duty to retreat.

The Son never offered a word of testimony as to why, when he heard "They're fighting," retreat was not both safe and feasible. He was not even asked. The very subject of retreat never came up. That is why we find it incongruous in this case to accept as a settled proposition that retreat was not a safe option for the Son, if fear for his own life was what justified his shooting of Calloway. Although he never testified to any such rationale, the Son would unquestionably ask us to presume from the circumstances themselves that he could not retreat because he could not abandon his Mother. We know of no case creating such an exemption from the duty to retreat as a part of self-defense law. The Son does not make a case for not retreating based upon the defense of others, to wit, his Mother. He simply would be attempting to engraft his responsibility for his Mother onto his case of self-defense. That graft will not take. What the Son attempts to do in this case is to blend self-defense law and the defense of others law (at least where the other is his Mother) into some synergistic agglomeration of both, satisfying the full requirements of neither defense but partaking of a bit of each. We reject this amalgam.

This failure to satisfy this indispensable element of the self-defense paradigm means that the Son for yet another reason should not have been eligible for the defense of self-defense. That further should mean that whatever else happens to some other component of the self-defense paradigm – such as the inadmissibility of the words "This is my block" – would be demonstrably immaterial.

The Son's general philosophy about retreat is also interesting. When asked why, on the earlier occasion when he and his Mother first arrived at the drug market and were exposed to Calloway's obvious hostile animus, he and his Mother did not simply get in their car and leave, the Son was Byzantinely nuanced in his response. He explained that the reason why he and his Mother could not leave precipitously was that Calloway would have interpreted their departure as a sign of weakness and thereby have been emboldened to be even more aggressive on future occasions. Such reasoning is truly geopolitical in terms of positioning themselves for future advantage in a potentially violent and competitive marketplace. Such reasoning is far more strategic than tactical. Such reasoning is not, however, a part of the lexicon of self-defense law, particularly when discussing the immediate duty to retreat.

### The Rationale For Restricting Self-Defense

In the multi-factored paradigm of self-defense law, the highly celebrated first factor sets out the extreme circumstance in which the use of deadly force may be permitted. Two other equally important factors, however, then set out restrictive circumstances under which such deadly force is absolutely forbidden even if that permissive first factor has presumptively been satisfied. The purpose of the restrictive factors is to reduce the utilization of deadly force in self-defense not only to those extreme situations in which it is presumptively permitted but to the even rarer situations in which an alternative to the use of deadly force is not safely available. A defendant may not focus only on the permissive factor and neglect the restrictive factors, as the Son did in the case now before us. That first factor does not exist in a vacuum.

The non-aggressor requirement and the duty to retreat requirement in combination teach a fundamental lesson about self-defense: "You may not strafe an anti-aircraft battery in self-defense, even if you are being fired upon by anti-aircraft guns." There will, of course, be other justifications, but one of them will not be self-defense. In the most basic of terms, you went to the anti-aircraft battery; it did not come to you. If rival gunslingers face off on the main street of Tombstone, are both entitled to claim self-defense? Or is neither? Both would presumably satisfy the high-profile first factor of being in fear of imminent death or bodily harm. Mutual combat, however, does not generate mutual claims of self-defense. A duelist may not claim self-defense. In terms of self-defense law at least, had Wyatt Earp not been the Town Marshall of Tombstone on October 26, 1881, his role at the O.K. Corral might have been more that of the aggressor than was that of Ike Clanton. Wyatt, after all, (along with Morgan and Virgil and Doc) was advancing on the corral, whereas Ike was merely standing his ground inside it. History, however, is written by the survivors.

These other lower-profile and restrictive requirements of self-defense law serve a vital social purpose in limiting and penalizing violence. Society basically does not want deadly face-offs on Front Street in Dodge City – or on Monroe Street in Baltimore City. If an alternative is available, you ignore it at your peril, as did the Son in this case.

### Cunningham v. State

In dealing with claims of self-defense, the defendant's belief that he is facing an imminent and immediate threat of death or serious bodily harm is only one factor in a multi-factored paradigm. Even establishing this high-profile factor or even a partial version

thereof (in the case of imperfect self-defense) will not relieve a defendant of also establishing, to a prima facie level, the other lower-profile factors in the defense.

In Cunningham v. State, 58 Md. App. 249, 473 A.2d 40 (1984), the Court of Special Appeals was dealing with a case very similar to the one now before us. At the critical moment seconds before the fatal shooting, Cunningham, as was the Son here, was moving toward the sound of the guns. Cunningham, as was the Son here, was armed, gun in hand. Cunningham, as did the Son here, claimed that he feared that the man he was advancing upon was going to shoot him, requiring him to shoot first:

> Even the appellant's best version of the facts only has the victim leaning on the Moped and "putting his hands by his pants." From this the appellant allegedly concluded that the victim "was apparently grabbing for something." The appellant stated that from this skimpy predicate, he was "afraid that he would be killed" and assumed that his victim had "a gun or something." He now boldly asserts that his own testimony as to his own subjective belief is sufficient to establish, if not an objectively reasonable belief in the necessity to kill, then at least an unreasonable belief in that necessity. This, he claims, entitled him to a jury instruction on the esoteric theory of imperfect self-defense.

58 Md. App. at 254. (Emphasis supplied.)

This Court rejected Cunningham's claim that he was even entitled to a jury instruction on imperfect self-defense. Cunningham's testimony might have generated an issue with respect to his belief in the threat to his life (reasonable or unreasonable), but that belief was only one of the necessary elements of the defense:

> The appellant's mistake is to look at a single element of the defense in a vacuum. Imperfect self-defense, of course, stands in the shadow of perfect self-defense. If the appellant's belief, reasonable or unreasonable, in the necessity to kill to preserve his own life is but one of the elements as to which he has the burden of producing a

45

prima facie case in order to generate a genuine jury question, <u>even a reasonable belief in the necessity to kill, would, standing alone, avail him naught</u>.

58 Md. App. at 254-55. (Emphasis supplied.)

The opinion of this Court, quoting W. LaFave and A. Scott, <u>Criminal Law</u> (1972), Sect. 77, pp. 394-95, turned to the factor of who was the aggressor:

> It is generally said that <u>one who is the aggressor</u> in an encounter with another – i.e., one who brings about the difficulty with the other – <u>may not avail himself of the defense of self-defense</u>. Ordinarily, this is certainly a correct statement, since <u>the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force</u>; and <u>the force defended against must be unlawful force, for self-defense</u>.

58 Md. App. at 255. (Emphasis supplied.)

This brings up an aspect of the present case that has not been touched upon. Let us assume, <u>arguendo</u>, that the Son's speculation about Calloway's reaching for a gun was correct. Picture the scene from Calloway's point of view. As Calloway stood up, in the immediate wake of having been attacked by the Mother, he sees the Son rapidly advancing on him, gun in hand. If Calloway had gotten off the first shots and killed the Son, would not Calloway have had a viable case of self-defense? If so, Calloway would have been using lawful force, not unlawful force. In such a case, the Son could not have claimed self-defense. "[T]he force defended against must be unlawful force." <u>Id.</u> Eight hundred years ago, the very notion of self-defense was created for the benefit of innocent victims and not for manipulation by mutual combatants. Our <u>Cunningham</u> opinion went on to discuss the duty to retreat as yet another factor in self-defense law:

> The exemption from the foreclosing effect of being the aggressor is unavailing to the appellant here. <u>It is first required that he be a nondeadly aggressor (the appellant here advanced with a loaded gun)</u>. It is additionally required that the aggressor be

46

one who in good faith effectively withdraws from any further encounter with his victim (and to make an effective withdrawal he must notify the victim or at least take reasonable steps to notify him). (The appellant here made no effort to withdraw from the encounter he had brought on.) As an aspect of his last requirement, the law universally imposes upon the original aggressor the duty to seize upon any opportunity to retreat.

58 Md. App. at 255. (Emphasis supplied.)

The Son may not fall back on the notion that even if his belief that he was in imminent danger of his life was unreasonable, it was nonetheless subjectively genuine and he is not, therefore, precluded from raising the defense. Cunningham makes it clear that shoring up one damaged factor is of no avail if the other factors of self-defense are still infirm:

> The very notion that, failing to establish a perfect component of a defense for purposes of total exculpation, the lesser establishment of that component in imperfect form may nonetheless argue for mitigation, is a notion that presupposes the establishment of all of the other elements that are necessary to comprise the defense. If a defense requires proof of A, B, and C, proving half of C for mitigation rather than all of C for exculpation still presupposes the proof of A and B. Absent proof of A and B, whatever happens to C, in whole or in part, is utterly immaterial. Although as a lesser defense, the partial proof of an element may still stand as a pale reflection of the fuller proof of that element, it can never forgive the total failure of proof as to other necessary elements. The appellant here would have his partial proof of one component of self-defense divert attention from his utter failure to produce even a prima facie case as to the other necessary element.

58 Md. App. at 257. (Emphasis supplied.)

The issue of self-defense in this case should, in our judgment, not even have been before the jury.

## "The Road Not Taken":
## The Inapplicability Of Self-Defense As An Issue

What is the situation, then, when part of the self-defense paradigm has been arguably satisfied, but all of it has not? Generally speaking, it should mean that the defense of self-defense had failed as an entirety. It should mean that a prima facie case of self-defense had failed and that self-defense, therefore, had not been generated as a genuine jury issue. We would like for this to have been our rationale for our holding that any error in not admitting into evidence the four words "This is my block" would have been demonstrably harmless because any influence the error might have had on the failure to establish a prima facie case as to the reasonable fear of death factor would not matter because of the other failures to establish a prima facie case with respect to self-defense. Even repairing or beefing up that one factor would not have saved self-defense as an entirety. As Cunningham held, 58 Md. App. at 257, "Absent proof of A and B, whatever happens to C is utterly immaterial."

A legal limitation, however, precludes us from relying on that rationale. It must be, reluctantly, "the road not taken."[5] For better or for worse, the issue of self-defense did go to the jury, despite our strong feeling that it should not have. The State never challenged that submission. With all of the concern and attention of all parties being focused on the high profile self-defense factor that could have made a difference between perfect self-defense and imperfect self-defense, we firmly believe that the other, lower profile factors,

---

[5]     Robert Frost, "The Road Not Taken" (1915).

that should have made a difference, were simply taken for granted. In any event, self-defense did go to the jury and verdicts were rendered. The combination of the two verdicts – not guilty of second-degree murder but guilty of manslaughter – depended entirely upon a finding of imperfect self-defense. A finding of imperfect self-defense, moreover, implies the necessary conclusion that the lower profile factors, such as non-aggressor status and the duty to retreat, were satisfied. Although we do not believe that the jury even considered those factors or was even aware of their existence[6], their verdict establishes otherwise. That combination of verdicts based upon imperfect self-defense is beyond our power to overturn.[7]

At this point our path might seem to be legally blocked, but, as in Robert Frost's "yellow wood," "two roads diverged." Legally barred from the road we would have preferred, we will take the other. It is called "Harmless Error."

**The Road Taken:**

---

[6]    To be sure, the jury instructions included a full definition of self-defense and that definition made mention of non-aggressor status and the duty to retreat. We do not mean to suggest otherwise. Those factors were not in any way highlighted or pointed out, however, as issues calling for express decision by the jury. By contrast, the permissive high-profile factor of fear of imminent death was so highlighted for express jury determination between perfect and imperfect self-defense. Did the Son actually have such a fear? Was that fear also objectively reasonable? On the other restrictive factors, however, we are persuaded that the jury almost certainly did not spontaneously raise and consider as issues for its decision factors that had never been raised throughout the entire course of the trial. Our conclusion is not based only on the jury instruction itself. Those lower-profile factors were never explored during the cross-examination of the Son. They were never argued during the closing arguments to the jury. They were, therefore, very easy to overlook.

[7]    A downside to our necessary downgrading of dispositive rationales, of course, is that it reduces our commentary on self-defense law and on the defense of others law to dicta. It is nonetheless carefully and thoroughly considered dicta.

## Harmless Error

Because the issue of self-defense went to the jury as a justiciable issue, we are procedurally estopped from holding that the manslaughter conviction is affirmed because self-defense was not an issue. Let us adopt an alternative rationale. Any error with respect to the assertion "This is my block" was inconsequential. Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665 (1978); Dionas v. State, 436 Md. 97, 118, 80 A.3d 1058 (2013); Taylor v. State, 407 Md. 137, 165, 963 A.2d 197 (2009).

### A. Thinking About Harmless Error

Before us in this case is the mirror image of what is more typically the harmless error scenario. Instead of asking the existential question, "Did what actually happened really hurt?," we must shift to the hypothetical question, "Could what did not happen, had it gone otherwise, really have helped?" Do we measure the negative consequence of what did not happen the same way we measure the affirmative consequence of what did happen? The answer is "absolutely, yes." The question is nonetheless worthy of a moment's pause.

The alleged error in this case was not the affirmative one of admitting the evidence in question, but the negative one of rejecting the evidence in question. In such cases, respective assessments of harmlessness require diametrically opposite analyses. In the case of affirmative admissibility of the evidence, we ask whether the actual evidence in fact hurt the defendant. In the case of the negative rejection of the evidence, we ask whether the missing evidence, had it hypothetically been admitted, would have helped the defendant. The distinction is between what actually happened and what, hypothetically, might have happened. Did the actual evidence hurt – in more than an inconsequential way? Could the

50

missing evidence, if hypothetically accepted, have helped – in more than an inconsequential way? [8]

The analytic common denominator, of course, is the phenomenon of inconsequentiality. If an item of evidence is truly inconsequential, its impact will be equally harmless, either in the existential context of actuality or in the imaginary context of hypothesizing. The ultimate answer, of course, is the same: Did it or would it have really made any difference? If this opinion were being written in Latin, however, our analysis of this mirror image of harmless error would be deeply immersed in the subjunctive mood.

## B. A Tsunami Of Hostile Animus

The Son bemoans the lack of more evidence of Calloway's animus toward him and his Mother. To be sure, the four-word assertion "This is my block" was relevant to show an animus on the part of Calloway against the Mother and vicariously against the Son. A tsunami of other evidence, however, overwhelmingly showed that very same thing, reducing the shred of evidence in question to relative inconsequentiality. Such an animus was inherent in the fact that Calloway and the Mother were rival drug pushers in the same

---

[8]      In adjudicating endlessly shifting questions of harmless error, judges regularly shift from the existential mood, asking if what actually happened really hurt, to the hypothetical mood, asking if what never happened but could have, might really have helped. They make this shift effortlessly, not consciously thinking about the shifting process. Appropriate may be the observation of the Anonymous, "Ode to a Waterbug":

> He fascinates the human race,
>        By gliding o'er the water's face,
> With ease, celerity, and grace;
>        But if he ever stopped to think,
> Of how he does it, he would sink.

open-air drug market. The animus was evident in the fact that Calloway and the Mother had frequently argued with each other on a regular basis over the course of many months. The animus was evident from Calloway's greeting of the Mother and the Son that morning, from his brandishing of a gun, and from his challenging of the Son, "Do you want some smoke?" and "What are you doing here?" The animus was evident in Calloway's agreement to engage the Son in a fistfight. The animus was evident in the actual physical brawl that Calloway and the Mother were engaged in as they wrestled with each other in the street. All of this tidal wave of evidence of animus was in the forefront of the Son's mind as he was faced with the decision of whether he should shoot Calloway in self-defense. The Son's fear of Calloway was not found to be unreasonable because of any lack of evidence of Calloway's animus.

One additional hostile remark would have been so relatively negligible as to have been absolutely nugatory. We are persuaded beyond a reasonable doubt that the alleged error in this case of rejecting the four-word fragment was absolutely harmless. The assertion, to be sure, was relevant, but its impact in proving the reasonableness of the Son's fear would have been no more consequential than a switch in the electoral vote of Kansas would have been in foreclosing Roosevelt's 1936 win over Alf Landon.

The Son's conviction for manslaughter is hereby affirmed.

## The Mother's Contention

As we turn to her essentially separate appeal, the Mother raises a single contention:

**WHERE DEATH OCCURRED AFTER THE ACCESORIAL CONDUCT, WAS THE EVIDENCE SUFFICIENT TO CONVICT APPELLANT OF ACCESSORY AFTER THE FACT TO MANSLAUGHTER?**

## A Challenge Not Adequately Preserved

The Mother's sole contention challenges the legal sufficiency of the evidence to support her conviction for being an accessory after the fact to the crime of manslaughter. On appeal, it is a highly particularized challenge, invoking a venerable but relatively esoteric aspect of accessoryship law. The esoteric requirement is that in cases where the predicate crime is a criminal homicide, murder or manslaughter, the mandatory time sequence is that the act of accessoryship must have occurred after the death of the homicide victim. At trial, by significant contrast, the challenge to legal sufficiency was blandly generic and definitely unparticularized.

At the end of the entire case, the motion for judgment here was, as is frequently the case, nothing but <u>pro forma</u>:

> THE COURT: All right. Ms. Pipkin.
>
> MS. PIPKIN: Thank you. Your Honor. Your Honor, <u>I will renew my motion</u> as well. Again, I will note that I do not believe there is evidence that would support that Ms. Worsley had any intention to shield Mr. Belton in her actions for which she is charged.
>
> THE COURT: All right.
>
> MS. PIPKIN: And I would submit.

(Emphasis supplied.)

Looking backward to the motion that was renewed, the motion for judgment at the end of the State's case was more plenary. The Mother made mention of the two crimes with which she was at that time charged – accessory after the fact to second-degree murder and accessory after the fact to manslaughter. The Mother's initial challenge was that the

53

State had failed to prove that those crimes had actually been committed and further that the State had failed to prove that the Mother had knowledge that they had been committed. On that challenge, the trial court talked the Mother down. Only then, secondarily, did she go on to challenge other elements of the crimes:

> MS. PIPKIN: Your Honor, Ms. Worsley is in a different situation, being charged with only two counts of being an accessory after the fact to Mr. Belton's murders. Your Honor, <u>I'll make a motion as to both of those</u>. As the Court is aware, <u>not only does the State have to prove that a crime was committed, but that the Defendant knew that the crime was committed. There's been no evidence at this point that she had any knowledge of</u> -
>
> THE COURT: There's --
>
> MS. PIPKIN: -- <u>the crime</u>.
>
> THE COURT: -- video that he's gunned down before her very eyes.
>
> MS. PIPKIN: Fair enough.

(Emphasis supplied.)

Nowhere in either of those motions for a judgment of acquittal was there the remotest mention of any required time sequence between the act of accessoryship and the death of a homicide victim. Such a time sequence was never mentioned in support of either motion. Such a necessary time sequence was never alluded to in any of the trial evidence. Such a necessary time sequence was not mentioned in any of the closing arguments to the jury. The required time sequence was not only not particularized, there was nothing from which such a required time sequence could even be inferred.

All of this means that the contention has not been preserved for appellate review. Maryland Rule 4-324(a) could not be more explicit in its absolute demand for particularity as a <u>sine qua non</u> of preservation, as it prescribes, <u>inter alia</u>:

> The defendant shall state with particularity all reasons why the motion should be granted.

That demand for particularity is absolute and unequivocal. As the Court of Appeals held clearly in <u>Hobby v. State</u>, 436 Md. 526, 539, 83 A.3d 794 (2014):

> When a defendant moves for judgment of acquittal, he or she must argue precisely the ways in which the evidence should be found wanting.

<u>Starr v. State</u>, 405 Md. 293, 304, 951 A.2d 87 (2008) spoke to the same effect:

> The trial court is not required to imagine all reasonable offshoots of the argument actually presented.

An argument or sub-argument that has not been stated with particularity cannot be considered on appeal. In <u>Albertson v. State</u>, 212 Md. App. 531, 569-70, 69 A.3d 1186 (2013) this Court spoke in similarly absolute terms:

> The language of the rule is mandatory, and review of a claim of insufficiency is available only for the reasons given by appellant in the motion for judgment of acquittal.

*See also* <u>Claybourne v. State</u>, 209 Md. App. 706, 750, 61 A.3d 841(2013) ("A defendant is not entitled to appellate review of reasons stated for the first time on appeal."); <u>Stanley v. State</u>, 248 Md. App. 539, 563, 242 A.3d 1126 (2020); <u>State v. Smith</u>, 244 Md. App. 354, 223 A.3d 1079 (2020).

We agree with the State that the challenge to the legal sufficiency of the evidence based on this required time sequence in homicide cases has not been preserved for appellate review.

The Mother asks that we overlook non-preservation by way of noticing plain error. We decline to do so. Because the Mother has raised this single contention and that contention has not been preserved for appellate review, our consideration of the Mother's appeal is hereby concluded.

**JUDGMENT OF CONVICTION OF TERRENCE BELTON FOR MANSLAUGHTER AFFIRMED; OTHER CONVICTIONS AFFIRMED; JUDGMENT OF CONVICTION OF SHAKIEA WORSLEY FOR ACCESSORY AFTER THE FACT AFFIRMED; IN CASE NO. 720/2020, COSTS TO BE PAID BY APPELLANT TERRENCE BELTON; IN CASE NO. 290/2020, COSTS TO BE PAID BY APPELLANT SHAKIEA WORSLEY.**